# CASES

## ARGUED AND DETERMINED

### IN THE

## UNITED STATES CIRCUIT COURTS OF APPEALS AND THE CIRCUIT AND DISTRICT COURTS.

CENTRAL TRUST CO. OF NEW YORK v. CITIZENS' ST. RY. CO. OF IN-
DIANAPOLIS et al.

(Circuit Court, D. Indiana. July 22, 1897.)

No. 9,448.

1. FEDERAL COURTS—SUIT AGAINST STATE OFFICER.
    This is not a suit against the state of Indiana, within the meaning of
    the eleventh amendment to the national constitution.

2. SAME—STATE DECISIONS.
    Where the controversy concerns a contract, and the meaning of the con-
    tract depends on the construction of a state statute or a provision of a
    state constitution, a decision on the meaning of said statute or constitutional
    provision by the highest court of a state, made after the contract was en-
    tered into, and rights had vested thereunder, is not conclusive upon a liti-
    gant in a federal court. The litigant in such case is entitled to the inde-
    pendent judgment of the national tribunal.

3. SAME.
    If the controversy in a federal court involve a federal question,—and all
    the more if it involve both a contract right, as above mentioned, and also a
    federal question,—then that court must decide for itself, treating a state
    decision with due consideration, but not as foreclosing independent judgment.

4. CONSTITUTIONAL LAW—VALIDITY OF SPECIAL STATUTES.
    The defendant railway company was incorporated under the act of 1861,
    that being a general law for the incorporation of street-railroad companies.
    By section 9 the power to fix the fare over its lines is given to the di-
    rectors. By section 12 it could use the streets only on terms prescribed by
    the city. By section 11 the power in the legislature to amend the act is
    reserved. The defendant railway company built and operated its lines on
    an agreement with the city that the fare for each passenger could be five
    cents. The act of 1897 professes to amend section 9 of the act of 1861.
    It provides that in cities which had a population of 100,000 or more, by
    the census of 1890, the fare could not be more than three cents; also, that
    the passenger must be transferred from one line to another without ad-
    ditional charge; also, a severe and ruinous code of penalties and forfei-
    tures. *Held,* that, under the constitution of Indiana, any law for the forma-
    tion of corporations for business and profit must be general,—that is,
    uniform in operation under like conditions whenever and wherever they
    exist, throughout the state; that the act of 1897 could never, under any
    circumstances, become operative elsewhere than in Indianapolis; that, if
    the act of 1897 be valid, then the entire law for the incorporation of street

82 F.—1

railroads would cease to be general and of uniform operation under similar conditions throughout the state, and become local as applied to Indianapolis, and local, also, as applied to portions of the state other than Indianapolis,—wherefore the act of 1897 is unconstitutional and void.

5. SAME—LAWS IMPAIRING OBLIGATION OF CHARTER CONTRACTS.
   The federal constitution provides that no state shall pass any law which impairs the obligation of a contract. The act of 1861, being the charter of defendant railway company, is a contract binding on the state of Indiana. The power to fix its rate of fare is expressly given to the railway company, subject to the condition in section 12 and the reservation as to amendment in section 11. The reservation covers no amendment which, if upheld, would make the incorporation act local or special. The act of 1897 would be a breach of the charter agreement, and this in violation of the federal constitution.

6. SAME—POLICE POWER.
   The police power of Indiana on the subject of rates is not to be applied as against a charter agreement with that state which covers the matter of rates.

On a former hearing, a preliminary injunction was granted. A statement of the case is found in the opinion then delivered. 80 Fed. 218.

The defendant the city of Indianapolis now demurs to the bill, and also moves to dissolve the injunction. It appears that, after the hearing on the motion for preliminary injunction, the city of Indianapolis brought suit in one of the state courts against one Navin, to recover a penalty, under an ordinance of the city, for alleged misconduct of Navin in boarding a street car, and refusing to pay the fare demanded, namely, five cents. This alleged offense by Navin was after the hearing on the motion for the injunction, but before the injunction had been granted. Navin pleaded the act of 1897, called in question by the complainant here, in justification. The cause went by appeal to the supreme court of Indiana, and that court, on the 11th of June, rendered a decision holding the enactment of 1897 valid. 47 N. E. 525. Motion to dissolve is made on the strength of that decision. Complainant on its part moves for leave to amend the bill by making defendants thereto certain persons who have brought actions in the state courts for penalties pursuant to said act of 1897.

Butler, Notman, Joline & Mynderse, Benjamin Harrison, Miller & Elam, and F. Winter, for complainant.

William A. Ketcham, James B. Curtis, John W. Kern, and Joseph E. Bell, for defendants.

SHOWALTER, Circuit Judge (after stating the facts as above): It is again urged that this suit cannot be maintained against Prosecuting Attorney Wiltsie, because he represents the state of Indiana. If the enactment here in question be valid, then Mr. Wiltsie does represent the state; not the state as a proprietor, however, but the state as a governmental agency. If the enactment be invalid, then he does not represent anything. On the latter hypothesis, he, or any successor to him in office, in attempting to enforce the penalties in the enactment of 1897, would be merely a wrongdoer. The theory of the bill is that that statute is unconstitutional and void. If complainant be mistaken on this one proposition, then the bill cannot be sustained as to any defendant. I get the impression from the argument and citations made that a "suit in law or equity" against a state, within the sense of the eleventh amendment to the constitution of the United States, is a suit affecting in some manner a property right of the

state, as a municipal corporation.   But the discussion on this point seems to me aside from the case at bar.   If, as said, the enactment of 1897 be invalid, then Mr. Wiltsie does not here represent the state; if it be valid, he does.   But, on the latter hypothesis, the entire suit must be disposed of before any question special to Mr. Wiltsie can arise.   The validity of the amendment, I take it, this court must pass upon.   What the rule of decision shall be,—whether the opinion of the state court shall be deemed final, or whether this court is charged with the responsibility of investigating the question independently,— on any view of that matter the validity of the amendment, so far as concerns this litigation, and apart from any subsequent review by the federal court of appeals or federal supreme court, depends upon the pronouncement of this court.   For these reasons, I doubt if the discussion concerning the force of the eleventh amendment be pertinent.

In Reagan v. Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, the legislature of Texas had, on April 3, 1891, passed an act establishing a board of three commissioners, with authority to fix rates on railroads in that state.   Section 6 of the act provided that, if any railroad company "or other party at interest" be dissatisfied with a rate as fixed by the board, such "dissatisfied company or party" could commence a proceeding in a court of competent jurisdiction in Travis county, Tex., against the board, and thus determine the question of reasonableness in such rate; and, from the decision there made, either party could "appeal to the appellate court having jurisdiction of said cause."   By section 5 of the same law it was provided, in substance, that the railroad company must carry for the rate fixed by the board, and that such rate be "conclusive and deemed   *   *   *   reasonable *   *   *   until finally found otherwise, in" the direct action provided for in section 6.   By section 14 of the same act, if any railroad company, its agent or officer, charged more than the rate fixed by the board, said "company and its said agent and officer" should "forfeit and pay to the state of Texas a sum not less than $100, nor more than $5,000."   Section 15 defined "unjust discrimination," and fixed a penalty of not less than $500, nor more than $5,000, upon any railroad company violating any provision of that section.   Other penalties were provided recoverable by "the person injured."   By section 19 it was made the duty of the attorney general of the state to prosecute suits in the name of the state for all penalties except those recoverable by individuals.   It will now be noticed that, by force of sections 5 and 14, a railroad company, unless it chose to accept the rates fixed by the board,—rates which had not yet been found reasonable by any judicial authority, and which might be in fact unreasonable,—would be subject to prosecutions at the suit of the state, instituted by the attorney general.   On April 30, 1892, the Farmers' Loan & Trust Company, a New York corporation, being mortgagee of the railroad property of the International & Great Northwestern Railroad Company, a company organized under the law of Texas, and having and operating its road entirely within the limits of that state, exhibited its bill in the circuit court of the United States for the Western district of Texas, making said railroad company, the three members of the board, and the attorney general parties defendant.   Upon the

showing of this bill that the rates fixed by the board were in fact unreasonable, the court issued its writ, enjoining the company from adopting such rate, the attorney general from instituting or prosecuting any suit to collect any penalty by reason of the failure of the company to adopt such rate, and the members of the board from any such action by them as would have been appropriate in aid of prosecutions by the attorney general had sections 5 and 14 been valid. This injunction was sustained by the supreme court of the United States. One contention before that court was that, by force of the eleventh amendment, the suit could not go against the attorney general, since in the enjoined prosecutions the state would be plaintiff, and the attorney general was the state officer and representative in that behalf. Mr. Justice Brewer, who delivered the opinion of the supreme court of the United States, reviewed the arguments and citations, and held that the suit was not against the state, within the meaning of the eleventh amendment. If section 5 had been valid for any purpose, or if section 14 had been valid according to its terms,—that is, as applied to any refusal of the company where the rate had not previously been judicially found reasonable as provided in section 6, and was in fact unreasonable,—then the attorney general, in the inhibited prosecutions, would certainly have represented the state. As the case stood, and assuming the invalidity of said sections, he represented nothing. His prosecutions would simply have been gross wrongs, under color of void legislative enactments. The opinion last cited was delivered in May, 1894. The position of Mr. Wiltsie here is the same as that of the attorney general in the Reagan Case. If the attorney general had not been specifically named as the officer to carry on the prosecutions under the Texas statute, that duty would have devolved upon some prosecuting attorney in Texas, and such officer, in place of the attorney general, would have been the defendant. I cannot hold that this suit, as against Mr. Wiltsie, is inhibited by the eleventh amendment, without disregarding the law as laid down by the supreme court of the United States. If, in the Reagan Case, sections 5 and 14 had been deemed valid, the injunction could not have issued or been sustained. Here the injunction is the purpose of the bill. If, as said, the enactment of 1897 be valid, the case fails, and the bill must be dismissed as to all defendants. If that enactment be invalid, Mr. Wiltsie, so far as the threatened prosecutions are concerned, does not represent the state in any capacity whatever. So much as preliminary to the matters which arise more particularly on this hearing.

When a federal question is involved, the decision of the highest court of the state is not final, but is reviewable by the supreme court of the United States. To this extent, at least, the judicial power of a state is subordinate to that of the United States. But there is no relation of subordination on the part of any federal court to any state court. In certain cases the federal courts, of their own motion, follow the decision of the state court, as determinative of the rights of a litigant. In Forsyth v. City of Hammond, decided April 19, 1897, by the supreme court of the United States (17 Sup. Ct. 665), it was ruled that a late decision of the supreme court of Indiana on the validity

of proceedings under Indiana statutes enlarging the boundaries of the city of Hammond was law for the parties, especially in view of the circumstance that Mrs. Forsyth herself had taken the appeal which resulted in that decision, and in view of the further circumstance that the state decision was upon essentially the specific controversy afterwards, in another form, made the subject of litigation in the cause before the supreme court of the United States. But where the controversy concerns a contract, and the meaning of the contract depends on the construction of a state statute or a provision of a state constitution, a decision on the meaning of said statute or constitutional provision by the highest court of a state, made after the contract was entered into, and rights had vested thereunder, is not conclusive upon a litigant in a federal court. The litigant in such a case is entitled to the independent judgment of the national tribunal.

Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, for instance, involved the construction of a contract between the defendant, a citizen of New York, and a Missouri corporation. The former had received certain shares of stock from the latter. Whether this stock was owned absolutely, or held as security for another obligation, was the question. The sense of the contract depended on the construction of a statute of Missouri. After the making of the contract, but before the decision in the supreme court of the United States, the supreme court of Missouri ruled, in another controversy between the same parties upon the same question, that, within the sense of the statute, the stock was owned, and not pledged. Having this decision before it, the supreme court of the United States made a contrary ruling, and this in a case where there was no federal question, but only diverse citizenship. If the Missouri decision had been prior to the contract, the federal tribunal would doubtless have said that the contract was made on the meaning of the statute as declared in the state decision, and that construction of the statute would doubtless have been followed, as of course. The Missouri statute, be it noticed, was in a sense part of the contract; that is, the court could not tell what the contract meant when the parties made it, without construing the statute. For a full and clear discussion of the subject and the cases in point, see the opinion of Lurton, Circuit Judge, in Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 334, 76 Fed. 296. If the controversy in a federal court involve a federal question,—and all the more if it involve both a contract right, as above explained, and also a federal question,— then, of course, that court must decide for itself, treating a state decision with due consideration, but not as foreclosing independent judgment. Whether the decision in the Navin Case, 47 N. E. 525, be conclusive upon the litigants here depends on the nature of the present controversy, in view of the rules above adverted to.

In the Dartmouth College Case, 4 Wheat. 519, it was ruled that the charter of a private corporation is a contract between the corporate body and the state, and that an act of the legislature changing the charter in any respect material to the rights of the corporation is a violation of that provision of the national constitution which inhibits a state from making a law impairing the obligation

of a contract. The action was trover, and the parties were citizens of New Hampshire. The appeal went to the supreme court of the United States, by reason of the federal question. The case was decided in 1819. This doctrine is still the law, and it applies to the charter of a railroad company. Take, for instance, Railroad Co. v. Smith, 128 U. S. 174, 9 Sup. Ct. 47. There the state of Georgia had granted a charter to a railroad company, and the contention was that, within the sense of this charter, the company was authorized or given the right to charge for carriage of freight as much as 50 cents per hundredweight, or 10 cents per cubic foot, for each hundred miles. The legislature of Georgia had passed a law creating a board, with authority to fix rates for common carriers. That board had prescribed rates much less than the 50 cents or the 10 cents mentioned above. The supreme court of the United States ruled that the railroad charter was a contract which the subsequent act could not alter; that if the charter provision, upon fair construction, had the meaning contended for, then the subsequent enactment could have no application as against it; but, upon examination of the words of the charter, they were held, when applied to the case before the court, not to have the meaning contended for. The doctrine of the Dartmouth College Case applies also to a railroad corporation organized under a general incorporation law. See, for instance, Railroad Co. v. Iowa, 94 U. S. 155. In such a case the sections of the general incorporation law constitute a contract between the state and any corporation organized thereunder. If in a charter it be provided that the corporation may charge rates up to or within a specified limit, or that the directors may, subject to certain limitations, themselves fix the rates in their discretion, such provision cannot be annulled or changed by the legislature unless power in that behalf be reserved as part of the charter agreement, and subsequent action by the legislature must be referred to and be within the reservation.

In Reagan v. Trust Co., supra, Mr. Justice Brewer says:

"If the charter had in terms granted to the corporation power to charge and collect a definite sum per mile for transportation of persons or property, it would not be doubted that that express stipulation formed part of the obligation of the state, which it could not repudiate."

In the case at bar it was provided in section 9 of the act of 1861, under which the defendant company was organized, that the directors should have the power to fix the fare on its street railroad; by section 12, that the corporation could not build tracks or operate cars on the streets at all except under conditions which the city would first agree to; and, by section 11, that "this act may be amended or repealed at the discretion of the legislature." The city agreed that the fare charged by the company might be as much as five cents. Subject to this, the right to fix the fare was vested in the corporation, and this right cannot be modified otherwise than as provided in the charter contract, namely, by amendment of the act according to the terms of section 11, when read in the light of those restrictions in the Indiana constitution bearing upon the matter of amendment to that act. There is no general authority in the

legislature under which the corporate power on the matter of fares can be changed in contravention of the charter contract. Whatever the legislature may do must be within the sense of section 11 of the act of 1861, that section being itself a term in the charter contract. 2 Mor. Priv. Corp. §§ 1106, 1095.

A railroad corporation chartered, for instance, by some other state, might own or operate a railroad in Indiana. Such a company would have no charter contract with the state of Indiana. The state might provide by law for a board authorized to fix rates, and such rates, if reasonable, might be rates for such foreign company, and regulate its charges in Indiana. Such a law would be within the power of the legislature. But the enactment of 1897, here in question, cannot be referred to any such untrammeled power in the legislature, since the charter agreement between the state and the defendant railway company covers the subject of rates. The grant by section 9 of the act of 1861 cannot be taken back, evaded, or annulled in any way other than that stipulated, namely, by a law which shall be an amendment to the act of 1861; and valid legislative interference must fall within the scope of section 11 of the act last mentioned, that being part of the agreement. The state and the corporation have agreed that, within the restrictions imposed by the constitution of Indiana on the legislative function touching any law for the formation of business corporations, the legislature may amend the act of 1861; and the question is whether or not the act of 1897 is, in view of said restrictions, competent, as an amendment to the act of 1861.

These distinctions are made here because, as will presently appear, the supreme court of Indiana rules in the Navin Case that the enactment of 1897 is solely by virtue of the general power of the state to legislate on rates. In this way that court clears the subject of constitutional objections. The defendant railway company is treated as though it had no charter agreement with the state of Indiana,—as though its charter had been granted, for instance, by Ohio or Illinois. The police power of Indiana on railroad tariffs is thought of as authority which is in itself unquestionable and all-sufficient for the enactment of 1897. Considered merely as referable to the police power, want of uniformity in operation, it seems to me, might be a valid objection to said enactment. But that question need not be discussed. I think it may be said as a general proposition that no enactment which would be invalid as an exercise of the police power could be valid as an amendment to the act of 1861; but, on the other hand, an enactment proposed as an amendment to the act of 1861 might be unobjectionable as a police law, and yet not be an amendment within the constitutional restrictions which concern a law like that of 1861. To hold such an enactment valid would sanction a breach of the charter agreement. Under a police law, the rates must be reasonable; but, where there is a charter agreement as to rates, that agreement controls. In Railroad Co. v. Smith, supra, though the rates fixed by the board might have been reasonable, yet if the court had found that the charter gave the corporation power to charge, if it saw fit, 50 cents per hun-

dredweight, or 10 cents per cubic foot, for each hundred miles, such could have been the rates, whether reasonable or unreasonable. I may add that a law for the purpose of securing and enforcing fair and reasonable charges by common carriers is not to be classed with those laws making for the public health and public morals, the power to enact which cannot be contracted away or parted with by the state.

It being now understood that the words of section 11 of the act of 1861, "This act may be amended * * * at the discretion of the legislature," constitute, in connection with sections 9 and 12, an agreement binding upon the state of. Indiana, what the sense of this agreement is—whether the enactment of 1897 is an amendment to "this act"—can be determined only by reference to certain provisions in the Indiana constitution bearing upon the question. As the supreme court of the United States, in Burgess v. Seligman, supra, was obliged to construe the statute of Missouri in order to find the meaning of the contract between Seligman and the corporation, so here the meaning of the contract between the state and the corporation cannot be known without a construction of said constitutional provision. If, in the light of constitutional restrictions on the legislative function touching any law for the formation of corporations, the act of 1897 be not competent as an amendment to the act of 1861, then, and in breach of the national constitution, the act of 1897 would impair the obligation of the charter agreement, as expressed in sections 9, 11, and 12, and should be held void. I take it as clear that no enactment can be competent as an amendment to the act of 1861 which, when read in connection with what would be left of said act, would make the whole an unconstitutional statute. If the enactment of 1897 be valid, then the law for the formation of street-railroad corporations in Indiana, as now extant, provides that in the one city which had a population of 100,000 in 1890, namely, Indianapolis, such a corporation cannot charge more than three cents for each passenger, no matter what its contract with the city may be, and must transfer passengers from one of its lines to another without extra charge, and this under a special code of penalties, involving the forfeiture of its street franchises and divers criminal prosecutions; while in any other city, regardless of population, now or hereafter, the rate agreed on with such city may be charged, the matter of transfers being there left to the company subject to agreement with the city, and the penal code applicable in the one city identified by the law can have no force. It seems to me that, as to the one city identified in the act, the law, on the hypothesis now under view, would be special and local, since it could never apply to street-railroad business by corporations organized under the act of 1861 in any other part of the state; and as to that portion of the state, other than the one city, it would be special and local, since it could not apply to the one city.

Section 22 of article 4 of the constitution of Indiana reads: "The general assembly shall not pass local or special laws in any of the following enumerated cases, that is to say, regulating the jurisdiction and duties of justices of the peace and of constables; for the

punishment of crimes and misdemeanors," and so forth, enumerating 15 additional subjects. Section 23, following in the same article, reads: "In all the cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general, and of uniform operation throughout the state." Section 13 of article 11 reads: "Corporations, other than banking, shall not be created by special act, but may be formed under general laws." From the language of sections 22 and 23, when read together, it will appear that a "local or special" law is any law which is not "general"; that is to say, "of uniform operation," as applied to similar conditions, "throughout the state." Assuming the validity of the enactment of 1897, then the law of which that enactment forms a part is "local or special," since it is not "general and of uniform operation throughout the state." The people of Indiana said in their constitution that, "where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state"; also, that "corporations, other than banking, * * * may be formed under general laws,"—in other words, that a general law can be made applicable when the formation of business corporations is the subject-matter of legislation. These propositions, when read together, express the meaning that any law for the formation of corporations must be general; that is to say, of uniform operation under like conditions throughout the state. The question whether or not a general law can be made applicable to the matter of corporate organization for enterprises of business and profit is thus foreclosed in the constitution itself. Upon this question no discretion or power of deciding is vested either in the legislature or the courts of the state. A law for the formation of street-railroad corporations must be general,—that is to say, of uniform operation, under similar conditions, throughout the state; otherwise, it is void. If the enactment of 1897 be held valid, then as an amendment it displaces a portion of the act of 1861 and becomes itself part of that law. The effect would be to make the entire law for the formation of street-railroad corporations local and special. Therefore the enactment of 1897 is unconstitutional and void.

As to any law on any one of the 17 subjects mentioned in section 22 of article 4 of the constitution, and as to any law for the formation of corporations for business and profit, the question whether such law may be local or special, or must be general, as these terms have already been explained, is settled in the constitution itself. Such law must be general, meaning of uniform application to similar conditions whenever they arise, and wherever they exist, in the state. A law upon any other subject may be special or local, provided a general law cannot be made applicable to such subject. Concerning this last proposition, the supreme court of Indiana long ago ruled that the question whether a general law could be made applicable was a judicial question, a question upon which the judgment of the legislature was not conclusive; and this, I suppose, upon the ground that it was for the courts to construe the constitution. Later, that court reversed this ruling, and held that the judgment of the legislature was conclusive. But never, so far as I am advised, until the Navin decision,

did that court suggest or intimate that the express declaration by the people of Indiana in their constitution, namely, corporations for business and profit "may be formed under general laws," left the legislature at liberty to decide that such corporations could not be formed under general laws.

In the case at bar the charter agreement between the corporation and the state on the matter of rates, as expressed in section 9 of the act of 1861, subject to the conditions in sections 12 and 11, was the chief consideration which induced the acceptance of the charter by the corporators, the expenditures by the corporation in the streets of Indianapolis, and the investment in the railroad property by this complainant. Under section 11, the security, aside from the wisdom and fairness of the legislature, was that an amendment could not be made otherwise than by an enactment which would still leave the law, as a whole, "general and of uniform operation" upon all corporations formed or to be formed under it, or at least upon all such corporations formed or to be formed as could be associated for legislative purposes by any germane and appropriate classification. No such classification is made by the act of 1897. To the contrary upon this proposition I find nothing in the opinion in the Navin Case. I may here add that, while the constitutional inhibition is against "local or special laws," the court rules in the Navin Case that it is not material whether the act of 1897 be "local" or not, the decision resting upon grounds entirely distinct from that question. The charter contract says: "This act may be amended at the discretion of the legislature." Is the enactment of 1897 an amendment to "this act," within the meaning of the foregoing reservation? This is the question, and it concerns the construction of the charter contract. Whether the act of 1897 is an amendment, and what discretion the legislature is vested with,—in other words, whether the act of 1897 would break, or be in accord with, the contract,—depends upon the sense of certain provisions in the constitution of Indiana.

I now call attention more specifically to the state decision in the Navin Case. Mr. Justice Monks says in the opinion:

"It is insisted by appellant that the act of 1897 is unconstitutional, because it impairs the obligation of a contract. Counsel for appellant do not point out any contract the obligation of which is impaired by said act. If it is the contract under which the street-railway company took possession of the streets of Indianapolis, and constructed its tracks, it is sufficient to say that the city was not authorized to enter into any contract which would prevent the legislature from legislating upon the subject of fares. It is settled law that the legislature has the power to reasonably regulate the rates of fare for transportation of passengers within the state on street railways."

Here a number of cases are cited; but they are upon the general proposition that, where there is no charter contract on the matter of rates, legislation looking to reasonable rates is competent. Not one of the citations concerns any street-railroad corporation organized under the act of 1861. The opinion proceeds:

"Besides, section 11 of said act of 1861, being section 5463, Rev. St. 1894 (section 4153, Rev. St. 1881), expressly reserves to the legislature the right to amend or repeal said act at its discretion. The right of the legislature, however, to regulate the fare upon street railroads organized under the act

of 1861, does not depend upon the reservation of the right to amend or repeal the act in section 11 of the act. That power would exist even if the right to amend or repeal the act had not been reserved."

How can this be? If section 11 were omitted, the legislature could not touch the subject of rates. Note the quotation made above from the Reagan Case. Does the supreme court of Indiana mean that, where a charter contains no reservation of power to amend, such reservation is implied, or that the vested rights of a corporation organized under a general incorporation law, which contained no reservation of power to amend, can be disturbed by any subsequent amendment? The opinion goes on:

"In order to exempt a common carrier from legislative control over its rates of fare, it must appear that the exemption was made in its charter by clear and unmistakable language, inconsistent with the exercise of such power in the legislature."

If section 11 had been omitted, then, as said, the charter agreement between the corporation and the state would have been that the directors of the corporation could fix the rates, subject to no condition or limitation other than the agreement with the city. As the case stands, the grant to the corporation as to rates is subject to no condition or limitation other than the agreement with the city and the agreement with the state that the legislature might, within the appropriate constitutional restrictions, repeal or amend the act of 1861. If the learned writer of the opinion means that, in addition to a contract covering the subject of rates, there must also appear in the charter an express exemption from such legislative action as might be competent if there were no contract at all,—which would be competent, for instance, as respects a carrier chartered by some other state,— I cannot agree with him. The three citations made by Mr. Justice Monks, among which are Railroad Co. v. Smith, supra, and Railroad Co. v. Iowa, supra, are to the point, as above stated herein, that, if the charter contract cover the matter of rates, legislative interference in that behalf, otherwise than within the terms of the contract, is unauthorized. The state opinion goes on:

"Appellant [meaning the city of Indianapolis] had the power to prescribe the terms upon which and the time for which a street-railroad company organized under said act of 1861 should occupy the streets of said city; but such contract, when made, was subject to the right of the legislature to amend or repeal said act at its discretion, and no contract made by the city with a street-railroad company could prevent the exercise of such power by the legislature."

Now follows the conclusion drawn by Mr. Justice Monks from those portions of his opinion hereinabove quoted:

"It is clear, therefore, that said act of 1897 does not impair the obligation of any valid contract of either the state or appellant."

If, in view of constitutional limitations touching the legislative function as to laws for the formation or creation of corporations, the act of 1897 be not competent as an amendment to the act of 1861, then said act of 1897 certainly does impair the obligation of the charter agreement, as well as the obligation of the contract made with the city; and this in violation of the constitution of the United States. The learned writer of the state opinion characterizes the enactment of

1897 as "a mere regulation of an existing corporation." In so doing, he still has reference to the police power as the untrammeled source of legislative authority for the enactment. But the state contracted that no amendment which would leave the act as amended a special or local law should be made. The point is that the enactment of 1897 is not the kind of amendment which it was stipulated in the charter agreement could be made. The long-settled doctrine that the 12 sections of the act of 1861 constituted a contract between the state of Indiana and any corporation organized under that act, and the terms of that contract, are ignored in the state opinion. The citations to the proposition that the act of 1897 is "a mere regulation of an existing corporation" concern what may be done when the state is not fettered by its own agreement, upon the face of which the other contracting party has acted and expended his money. It is said in the state opinion that the legislature, since the adoption of the present constitution in 1851, has occasionally, and by some special, specific enactment, "enlarged the powers and privileges" of some particular corporation organized by special charter prior to 1851. Surely, the legislature could not diminish the powers and privileges (so as to destroy a vested property right) granted by a special charter to a business corporation, unless by a term in the charter reserving that power. The argument seems to be, however, that, in view of the legislative practice referred to touching old corporations under special charters, the grant of an additional power or privilege to an existing corporation is not inhibited by the words in the constitution, "Corporations  *  *  *  shall not be created by special act." It is thence, apparently, inferred that a special enactment, like that of 1897, destroying the right previously vested in the defendant railway company to fix the fare on its lines at five cents, is not unconstitutional. But the scope of the agreement between the state and the defendant company is that any such change on the subject of fares must be by an amendment which, when put into the charter, would still leave that instrument a general law for the formation of street-railroad corporations; that is to say, a law uniform in operation under like conditions throughout the state.

If before this defendant company was organized, or, possibly, if before this complainant took its mortgage, the supreme court of Indiana had decided that an enactment taking from the street-car companies of one particular city the power to fix rates as agreed upon with that city was, within the terms of the Indiana constitution, an amendment of the act of 1861, the case here would be different. But, as the matter stands, it seems impossible to say that the parties litigant here are not entitled to the opinion of this court treating the decision of the supreme court of Indiana with respectful and careful consideration, but not as of binding force. Apart from the diverse citizenship of the parties, there is here distinctly the question whether or not the enactment of 1897 impairs the obligation of the charter contract,—whether or not the enactment of 1897 does not violate the constitution of the United States. The decision of the Indiana court (assuming that appellant in that case was entitled to, and did, make upon the record the federal question) is not final, but subject to review by the supreme court of the United States. In Burgess v. Seligman, be it noticed,

there was no federal question, and the decision of the state supreme court was final and conclusive upon the parties and the state courts.

In Adams Exp. Co. v. Ohio State Auditor, 165 U. S. 194, 17 Sup. Ct. 305, the decision of the supreme court of Ohio upon the question whether the tax law in controversy violated the constitution of Ohio was held final. But this feature of that case raised no federal question. The state of Ohio had made no contract the sense of which was to turn on the meaning of the Ohio constitution, as authorizing or not authorizing such legislation. In deciding merely that the statute in question was not in violation of the constitution of the state, the supreme court of Ohio had no federal question before it. But the construction of the statute, apart from its relation to the constitution of Ohio, by the Ohio court, was not taken as final by the federal courts. There was no claim made that the law, if valid, would break the obligation of any contract to which the state was or was not a party; but it was contended that the act violated certain other provisions of the national constitution. On this contention the opinion of the supreme court of Ohio was not treated as conclusive. The federal courts followed that court merely because they agreed with it.

The federal question is more distinctly to the front in the case at bar than even in Reagan v. Trust Co. In the latter case it did not appear that the charter contract contained any express provision as to rates. The court inquired whether an engagement by the state to permit reasonable rates 'was not an implied term in the charter contract, and ruled that this inquiry brought the charter contract into the case for construction. If the charter contract contained such an implied term, then the question would be whether the statute objected to in that case was in violation of that contract. Following is the language of Mr. Justice Brewer:

"Still another matter is worthy of note in this direction. In the famous Dartmouth College Case, 4 Wheat. 518, it was held that the charter of a corporation is a contract protected by that clause of the national constitution which prohibits a state from passing any law impairing the obligation of contracts. The International and Great Northwestern Railroad Company is a corporation created by the state of Texas. The charter which created it is a contract whose obligation neither party can repudiate without the consent of the other. All that is within the scope of this contract need not be determined. Obviously, one obligation assumed by the corporation was to construct and operate a railroad between the termini named; and, on the other hand, one obligation assumed by the state was that it would not prevent the company from so constructing and operating the road. If the charter had in terms granted to the corporation power to charge and collect a definite sum per mile for the transportation of persons or of property, it would not be doubted that that express stipulation formed a part of the obligation of the state, which it could not repudiate. Whether, in the absence of an express stipulation of that character, there is not implied, in the grant of the right to construct and operate, the grant of a right to charge and collect such tolls as will enable the company to successfully operate the road, and return some profit to those who have invested their money in the construction, is a question not as yet determined. It is, at least, a question which arises as to the extent to which that contract goes, and one in which the corporation has a right to invoke the judgment of the courts; and if the corporation, a citizen of the state, has the right to maintain a suit for the determination of that question, clearly a citizen of another state, who has, under authority of the laws of the state of Texas, become pecuniarily interested in, equitably, indeed, the beneficial owner of, the property of the corporation, may invoke the judgment of the federal courts as to whether the contract rights created by the charter, and of which it is thus

the beneficial owner, are violated by subsequent acts of the state in limitation of the right to collect tolls. Our conclusion from these considerations is that the objection to the jurisdiction of the circuit court is not tenable."

I may here add, in connection with the matter above quoted, that the Reagan Case must necessarily be understood as presenting a federal question, and not only a federal question, but a question which concerned "the construction or application of the constitution of the United States," or a question which concerned "the constitution or law of a state," as being "in contravention of the constitution of the United States"; otherwise, the Reagan Case could not have gone, in the first instance, to the supreme court of the United States, but must have gone to the court of appeals of the Fifth circuit. It will be seen from the foregoing quotation from the opinion of Mr. Justice Brewer what one federal question was.

In the case at bar there can be no inquiry as to the reasonableness of the three-cent rate, or the unreasonableness of the five-cent rate, unless the enactment of 1897 be, within the terms of section 11, when read in the light of constitutional restrictions, an amendment to "this act," meaning the act of 1861. If the enactment of 1897 be void, then the city and Mr. Wiltsie, in enforcing it, would be mere wrongdoers. The bill avers, in effect, that, if no injunction be granted, the railway company will either obey the "law" through fear of the city and defendant Wiltsie, in which case the complainant's security will be diminished in value, or, in defiance of the city and defendant Wiltsie, refuse to obey, in which case the security will be destroyed. Under the circumstances, and assuming the act of 1897 invalid, can the defendants the city and Wiltsie insist, as against this bill, that complainant must show that a reduction from five cents to three cents in the fares would make the income from the mortgaged property insufficient to pay operating expenses and the interest on the mortgage debt? Does it lie in the mouth of a mere wrongdoer, as against a proceeding to stop the wanton destruction or impairment in value of a given property, to object that, since the complainant holds the property as security for a debt, he can have no cause of complaint, without a specific showing that there will not be enough value left, after the proposed spoliation, to satisfy the debt? The complainant's lien attaches as much to that portion of the property which is to be destroyed as to any other. The general owner whose management of mortgaged property is objected to by a mortgagee may well urge that what he proposes to do with said property will still leave ample security. But what right would a mere wrongdoer have as against even a mortgagee to destroy any portion of the property pledged? The demurrer is overruled, the motion to dissolve the injunction is denied, and complainant's motion to amend is allowed.