## HOME TELEPHONE & TELEGRAPH CO. v. CITY OF LOS ANGELES et al.

(Circuit Court, S. D. California, Southern Division.    July 8, 1907.)

### No. 1,243.

1. TELEPHONES—RATES—REGULATION—STATE POWER.

A state has power to regulate charges for telephone service and to delegate such power to municipalities.

2. SAME—CITY CHARTER—CONSTRUCTION—AUTHORITY OF CITY.

Const. art. 4, § 33, provides that the Legislature shall pass laws for the regulation of charges for services performed and accommodations

furnished by telegraph companies. Los Angeles City Charter, art. 3, § 12, provides that all legislative power of the city is vested in the council, subject to the mayor's veto power, and section 31 declares that the council shall have power by ordinance to regulate telephone service, the use of telephones within the city, and to fix and determine the charges for telephones and telephone service and connections, etc. *Held*, that the city council's power to fix telephone rates was not limited to a determination of the charges to be made by a telephone company permanently by contract so as to preclude the council from subsequently passing another ordinance changing the rates.

3. SAME—TELEPHONE RATES—MUNICIPAL AFFAIR—DISCRIMINATION.

The regulation and fixing of charges to be made by telephone companies doing business within a city is none the less a "municipal affair" within the jurisdiction of a city, because rates so fixed would not be uniform throughout the state; the reasonableness of the charge depending on the value of the plant, cost of maintenance and operation, etc., which varies in different localities.

4. SAME—REGULATION OF CHARGES—MODE.

Const. art. 4, § 33, provides that the Legislature shall pass laws for the regulation and limitation of the charges for services performed and accommodations furnished by telegraph companies; and, where laws shall provide for the selection of any person or officer to regulate or lower such rates, no such person or officer shall be selected by any corporation or individual interested in the business to be regulated and no person shall be selected who is an officer or stockholder of any such corporation. *Held*, that such provision does not contemplate the accomplishment of its purposes by general state law, or through commissions, but by a suitable delegation of power to municipalities.

5. SAME—ORDINANCE—VALIDITY.

Under Los Angeles City Charter, art. 3, § 31, authorizing the city council to fix and determine the charges to be made for telephone services, the city had power to pass an ordinance requiring telephone companies to report to the city council the value of their plant, receipts, and expenditures in order to enable the city to prescribe reasonable rates.

6. SAME—TELEPHONE RATES—POWER TO FIX—POLICE POWER—SURRENDER.

Control of telephone rates by a municipality is an exercise of police power of the state; and, while this right may be surrendered or suspended by contract, such suspension will not be presumed.

7. SAME—REGULATION OF RATES—RIGHTS OF MUNICIPALITIES—SUSPENSION.

A city being authorized to fix and regulate telephone rates granted a franchise under Cal. St. 1901, p. 267, c. 103, providing for the sale of franchises under which complainant's assignor and his assigns were given the right for a period of 50 years to construct, maintain, and operate a telephone line. The ordinance fixed the charges not to exceed $60 per annum for business telephones and $30 per annum for private telephones until the exchange comprised more than 10,000 telephones, after which the rates should not be increased by more than a sum equal to $6 per annum for each 1,000 phones connected in excess of the 10,000. In consideration for this franchise, the telephone company furnished 30 telephones to the city gratis and also provided 150 pairs of wires in its conduits and the upper arms of its poles for the use of the city's police and fire alarm telegraph system and agreed to pay a 2 per cent. gross earnings tax. *Held*, that the city by such ordinance did not surrender its right to regulate rates for the 50-year term of the franchise, but that the city was entitled to reduce the rates below the maximum charge so fixed during such term.

8. CONSTITUTIONAL LAW—IMPAIRMENT OF CONTRACT.

Where a city by granting a telephone franchise had not surrendered its charter right to fix telephone rates, the subsequent passage of an ordinance establishing lower rates than the maximum rates fixed by the

franchise ordinance was not an impairment of the telephone company's contract franchise rights.

**9. SAME—EQUAL PROTECTION OF LAWS.**

Where a city was authorized by its charter to regulate telephones and to fix and establish rates, an ordinance fixing lower rates for one company than those another company was permitted to charge within the same city was not invalid as denying the first company the equal protection of the laws.

**10. SAME—UNLAWFUL DISCRIMINATION.**

The mere fact that different rates were prescribed by ordinance for two companies operating telephone lines within a city did not of itself establish unlawful discrimination against either.

**11. INJUNCTION—ORDINANCES—RIGHT TO ENJOIN ENFORCEMENT.**

Where a city having the charter right to regulate telephones and fix rates passed an ordinance requiring telephone companies to submit a statement of the value of their plants with their receipts and disbursements in order that the city might establish reasonable rates, complainant telephone company, while refusing to comply with such ordinance, could not seek to enjoin the enforcement of rates established by the city council, in the absence of such information, on the ground that the ordinances were void.

**12. CONSTITUTIONAL LAW—DUE PROCESS OF LAW—NOTICE.**

Where a city had charter power to regulate telephones and fix rates, a telephone company had no right to notice of the passage of an ordinance fixing the rates it was authorized to charge, so that such ordinance passed without notice was not unconstitutional as depriving the telephone company of its property without due process of law.

## In Equity. Demurrer to the bill.

This suit was brought to restrain the enforcement of two ordinances attached to the bill, respectively, as Exhibits C and D, and hereinafter more fully set forth.

The allegations of the bill are substantially as follows:

The city of Los Angeles exists, and since 1888 has existed, under a freeholders' charter.

That by section 2 of said charter said city is vested with power to provide and maintain a proper and efficient fire department, and make and adopt such rules and regulations for the preservation of property endangered by fire as may by it be deemed expedient, and to make and enforce within its limits local police, sanitary, and other regulations deemed by it expedient to maintain the public peace and protect property, and to exercise all municipal powers necessary to the complete and efficient management and control of municipal property and for the efficient management of the municipal government, whether such powers be expressly enumerated in such charter or not, except such powers as are forbidden or are controlled by general laws.

That all legislative power of said city is vested in the city council, subject to the power of veto and approval by the mayor.

That under section 31 of said charter said council has power by ordinance to regulate telephone service and the use of telephones within the city and to fix and determine the charges for telephone and telephone service and connections, and to prohibit or regulate the erection of poles for telephones, telegraph or electric wires in the public grounds, streets, or alleys of said city, and the placing of wires thereon, and to require the removal from the public grounds, streets, or alleys of any or all such poles and the removal and placing under ground of any or all telegraph, telephone, or electric wires.

That by section 33 of said charter the council is required by ordinance to provide for maintaining a fire alarm and police telegraph system.

That "it is further provided in and by said charter that said council shall also have full power to pass ordinances making contracts and upon any other subject of municipal control or to carry into effect any other powers of the municipality."

That prior to December 9, 1901, an application was filed with the governing or legislative body of defendant by M. A. King for a franchise to construct, maintain, and operate a telephone system, and that, on the 6th day of February, 1902, an ordinance, attached to the bill as Exhibit B, was passed granting said franchise, and that all the steps and proceedings required by law and the provisions of said charter for the advertisement and sale of said franchise and the approval thereof, and all other matters connected therewith, were duly had and taken.

That, by regular assignments from M. A. King and others, plaintiff became and now is the owner of said franchise and telephone system.

That immediately upon the taking effect of said ordinance as aforesaid the assignors of this plaintiff, pursuant to the terms thereof, commenced the work of constructing and laying down the conduit required by said ordinance in the district therein described, and continuously prosecuted said work in good faith and completed the same in full compliance with the conditions of said ordinance relating thereto, and within the period therein prescribed, so that within said period a complete conduit system was established of sufficient capacity and extent to accommodate at least 10,000 subscribers and to provide a general telephone service in all parts of said telephone conduit district, and that likewise the said assignors of this plaintiff did, pursuant to the terms and conditions of said ordinance and in good faith, expend for material and labor used and performed in the construction and installation in connection therewith of wires, switchboards, and telephonic apparatus and appliances, and within the time specified in said ordinance, sums greatly in excess of the sums therein specified to be so expended, and did so expend more than the sum of $200,000 within 36 months after the grant of said franchise.

That the assignors of plaintiff did also, within the periods of said ordinance provided, after the grant of said franchise, file a statement, verified as therein provided, showing in detail the sums expended as required by and in compliance therewith, and did also cause to be erected and maintained poles of a size and character satisfactory to the street superintendent of said city of Los Angeles, and that the assignors of said plaintiff and this plaintiff have executed and complied with and observed, and that the said defendant the city of Los Angeles has never at any time claimed or pretended that plaintiff's assignors and this plaintiff had not executed, complied with, and observed the terms, covenants, and provisions of said ordinance as aforesaid.

That all of the work done and performed by plaintiff's assignors and by this plaintiff as aforesaid, and the expenditures made by it for any and all equipment and appliances as aforesaid, were made, done, and performed pursuant to and in reliance upon the terms, covenants, and provisions of said Ordinance No. 6,959 of said city of Los Angeles, and not otherwise, and that the system of plaintiff in said city of Los Angeles is now and at all times has been maintained and operated pursuant to and in reliance upon the terms, conditions, and covenants of said ordinance and not otherwise, and that plaintiff has no rights of property in the said city of Los Angeles except such as were acquired under the said Ordinance No. 6,959.

That pursuant to the powers vested in it by law and the provisions of said charter, and in order to provide for maintaining a fire system and police telegraph system, the said defendant the city of Los Angeles required in and by section 8 of the said ordinance that this plaintiff should furnish to the said city of Los Angeles, if required by it, free of any charge at all during the life of the said franchise granted by said ordinance, the use of all necessary conductors, not exceeding 150 pairs in said conduit, for the uninterrupted use of a fire system and police system of said city, and for like purpose the free use of the top cross-arm on each of the poles erected or maintained under said franchise during the whole term thereof; that this plaintiff, in constructing and laying said conduits and in constructing and erecting its pole lines and in providing its equipment, made provision for said 150 pairs of lines in said conduits and for the maintenance and operation thereof, and provided that said top cross-arms on each of said poles, and in all respects and at additional cost and expense to it arranged to comply with such provisions of said ordinance, and is now, and at all times has been, able and willing to

furnish said conductors, and has as aforesaid reserved the top cross-arm on each of said poles for the use of said city.

That it is also provided in and by section 8 of said ordinance that there shall be furnished to the said city of Los Angeles, free of any charge, 30 telephones which shall be connected with the telephone system of plaintiff, and that this plaintiff did, within the time provided and specified in said franchise, so furnish to the defendant said 30 telephones, and did connect the same with the telephone system of this plaintiff, all at its own cost and expense, and without charge to the said city of Los Angeles, and that the said city of Los Angeles is now, and ever since has been, using free of charge as aforesaid the said 30 telephones.

That section 1 of said ordinance provides: "That said conduit, said poles, and the wires inclosed therein or attached thereto, shall be constructed, erected and installed, and at all times maintained, and said right, privilege and franchise is hereby granted, and shall at all times be exercised and enjoyed, in accordance with and subject to each and every of the terms of this ordinance and not otherwise."

That section 9 of said ordinance provides: "That all telephone lines constructed or operated under said franchise shall have complete copper metallic circuits, and that the conduit system constructed and laid down under said franchise shall be of such size and capacity as to accommodate wires, cables and conductors, sufficient to provide for ten thousand telephones. That the rent or charge for unlimited, independent, metallic circuit, telephone service, in the system established or maintained under said franchise so long as said system does not connect and exchange with more than 10,000 telephones, shall not exceed $60 per annum for a telephone installed in any business office or premises, or $30 per annum for a telephone installed in a private residence, and that when said system shall comprise more than 10,000 telephones, the annual rental or charge for the telephone service shall not be increased by more than a sum equal to $6.00 per annum for each one thousand telephones in said city connected with said telephone system in excess of 10,000."

That the rate established by said franchise was at said time lower than any which had ever been charged for telephones in said city, and lower than any other company than plaintiff now charges for telephone service in said city, and that there was not at any of the times herein mentioned any system of telephone lines with complete copper metallic circuits, other than the system of plaintiff.

That at the time of the advertising and sale of said franchise there was in operation in said city of Los Angeles one system of telephonic communication only, and that the corporation owning the same continues to do business in said city.

That at the time said franchise was advertised for sale and sold the city required the use of 150 pairs of lines as provided for in said franchise and the use of the top cross-arm of each pole to be erected under said franchise for the fire alarm and police telegraph system of said city, and said city needed the use of 30 telephones, as provided in said franchise; and all of said telephones have been used by the said city ever since the construction of said plant of plaintiff, and are now used by the city, and the city is using some of the lines in the conduit of plaintiff, and the top cross-arm of some of its poles, and the city has need for the things it is using as aforesaid for public benefit and in the discharge of its functions.

That by section 10 it is provided that the owner of said franchise shall in no way enter into any combination at any time, directly or indirectly, with any person or persons, or any corporation, concerning the rate to be charged for telephone or telegraph service.

That the reasonable value to the said city of Los Angeles of the use of said 30 telephones provided by said franchise to be furnished free of charge, and the free use of 150 pairs of lines for the fire system and police telegraph system of said city, and the free use of the top cross-arm on each of the poles erected and maintained under said franchise, are and will be during the life of said franchise of the sum of $450,000. That 2 per cent. of the gross annual

receipts required by said franchise to be paid to the city of Los Angeles will amount to more than the sum of $500,000.

That the plaintiff and its assigns, acting under and pursuant to the terms of this franchise and not otherwise, and particularly on the clauses thereof declaring maximum rates, have constructed more than 5 miles of underground conduit and constructed more than 100 miles of pole lines, and have installed more than 20,000 telephones in said city, and did, in compliance with said franchise, and at great additional expense, construct and erect and is now operating a system of telephone lines having complete copper metallic circuits.

That, on March 27, 1905, the city council of said city passed an ordinance, which is attached to the bill, marked Exhibit C, the twelfth section of which provides as follows: "Sec. 12. It is hereby made the duty of every person, firm or corporation supplying telephones, telephone service or telephone connections to the city of Los Angeles or its inhabitants, to furnish to the city council in the month of January of each year, a statement in writing verified by the oath of such person, or of a member of such firm, or of the president or secretary of such corporation, as the case may be, showing in detail, the amount received by such person, firm or corporation from the renting of telephones, the furnishing of telephone service and the making of telephone connections within the city of Los Angeles, and the revenue derived by such person, firm or corporation, or in any manner arising from the use or operation of a telephone system in the city of Los Angeles, in connection with a telephone system outside of the city of Los Angeles, during the year preceding the date of such statement, and showing in detail all expenditures made by such person, firm or corporation, during the same time for supplying telephones, telephone service and telephone connections to the city of Los Angeles and its inhabitants, and for the purchase, construction and maintenance respectively of the property necessary for the carrying on of such business. Every such person, firm or corporation shall furnish a detailed statement verified in like manner as the statement, hereinbefore in this section mentioned, containing an itemized inventory of all of the works, lines, plant and property owned or used by such person, firm or corporation and necessary or convenient to the carrying on of the business of supplying telephones, telephone service and telephone connections to the city of Los Angeles, or to the inhabitants thereof, and showing the actual cost and present cash value of each item thereof."

That plaintiff has not complied with said section 12 of Ordinance C, nor any part thereof, and plaintiff declines to comply therewith for the reasons herewith set forth.

That said city has arrested and commenced prosecutions against plaintiff's officers, and will continue to arrest and prosecute plaintiff's officers for violations of Ordinance C, unless restrained therefrom.

That defendant, on February 28, 1906, passed an ordinance which is attached as Exhibit D to the bill, fixing rates to be charged by plaintiff for telephone service, and forbidding plaintiff, under penalty of imprisonment, from collecting the rates provided and fixed in ordinance Exhibit B, and will, unless restrained by this court, continue from time to time to pass other similar ordinances.

That the said city, on February 28, 1906, adopted another ordinance, attached to the bill as Exhibit E, whereby a competitor of plaintiff in said city, engaged in like business, was allowed to charge for telephone services sums greatly in excess of that which by said Ordinance D plaintiff is permitted to charge.

That Ordinances C and D, if carried into execution, will impair the obligations of a contract, Exhibit B, and deprive plaintiff of its property without due process of law, and abridge the privileges and immunities of this plaintiff, and deprive it of the equal protection of the law, and that the adoption of said ordinances, Exhibits D and E, fixing the different rates to be charged for the same services, deprives plaintiff of the equal protection of the law and discriminates against plaintiff in favor of the Sunset Telephone & Telegraph Company, a similar corporation, all of which is in violation of the Constitution of the United States, and particularly in violation of article 1, § 10, cl. 1, of said Constitution of the United States, and the fourteenth amendment

thereto, and also is in violation of the Constitution of the state of California.

That said Ordinance D is void, for that it is not a general law adopted by said city for the government of all corporations similar in character to plaintiff, but is directed solely against, and applicable to, plaintiff, and discriminates against plaintiff.

That said Ordinances D and E are void, for that said city never had, under the Constitution and laws of the state of California, any power or authority to regulate or fix rates to be charged by telephone corporations for services rendered by them, except that the city of Los Angeles had and has the power to contract for rates to be charged, and had and has the right to contract in the manner and form as shown by said ordinance, Exhibit B.

That, if the provisions of said charter operate to give the city of Los Angeles the right to fix rates other than by contract or purport or attempt to give it a continuing power to fix and regulate rates of this plaintiff, such provisions of said charter are void, for that in and by the Constitution of the state of California the power to fix such rates, if such power exists at all, can only be exercised by authority of a general law applicable to all municipalities and affecting all corporations similar to plaintiff, and that the Legislature of the state of California has no authority by virtue of said Constitution or otherwise to delegate the power of so fixing rates from time to time to any one municipality or other political subdivision at all, to the exclusion of the others, and has no authority by delegation of its powers to fix the rates to be charged by plaintiff.

That the Legislature of said state of California has never passed, nor is there now, nor has there ever been, in force any general law or statute authorizing the fixing or regulation of rates as aforesaid, but that such general power has been and is withheld from other cities and municipalities within the state.

Ordinance D is as follows:

### "Exhibit D.

### "Ordinance No. ——. (New Series.)

"An ordinance fixing the rates to be charged and collected by the Home Telephone & Telegraph Company, a corporation, for telephones, telephone service and telephone connections, in the city of Los Angeles, during the year commencing July 1st, 1906, and ending June 30th, 1907.

"The mayor and council of the city of Los Angeles do ordain as follows:

"Section 1. That the rates to be charged and collected by the Home Telephone & Telegraph Company, a corporation, for telephones, telephone service and telephone connections in the city of Los Angeles, furnished to the city of Los Angeles, or to the inhabitants thereof, for the year commencing on the 1st day of July, 1906, and ending on the 30th day of June, 1907, are hereby fixed as follows:

"(1) For each telephone installed and maintained in any business office or premises, connected with the central exchange by an independent or individual circuit, with unlimited service, $5.00 per month.

"(2) For each telephone installed and maintained in any house or place other than a business office or premises, connected with the central exchange by an independent or individual circuit, with unlimited service, $2.00 per month.

"(3) For each extension telephone, $1.00 per month.

"(4) For each private telephone exchange connected with the central exchange by an independent circuit on one trunk line, $5.00 per month; and for each additional trunk line, $4.00 per month; and for each telephone station in such private exchange, $1.00 per month.

"Section 2. Any person who shall charge, demand, collect or receive, either as officer, agent, collector or employé of the said Home Telephone & Telegraph Company, any rate or compensation for telephones, telephone service or telephone connections in the city of Los Angeles, furnished by the said Home Telephone & Telegraph Company to the city of Los Angeles or to any inhabitant thereof, during the year commencing on the 1st day of July, 1906, and ending on the 30th day of June, 1907, in excess of the rates fixed by this ordinance, shall be deemed guilty of a misdemeanor, and upon conviction

thereof, shall be punishable by a fine in a sum not exceeding one hundred dollars, or by imprisonment in the city jail for a period not exceeding ninety days, or by both such fine and imprisonment."

There is no express provision in the charter conferring upon the city contractual, power, as alleged in the bill, and presumably that allegation is the statement of the pleader's conclusion as to an implied power. However, this matter, as appears from the opinion of the court, is immaterial here.

Oscar A. Trippet and A. B. McCutchen, for complainant.
W. B. Mathews and Leslie R. Hewitt, for defendants.

WELLBORN, District Judge (after stating the facts as above). Plaintiff cites numerous authorities showing this to be a case of equitable and also of federal cognizance. Defendants, however, have not suggested any lack of jurisdiction in either respect, nor is there any ground for such contention. No further reference, therefore, will be made to plaintiff's authorities on this point.

The questions about which the parties are at issue may be conveniently grouped under three general heads as follows: First. Did the laws of the state of California, at the time of the passage of the ordinances attached to the bill as Exhibits C and D, and here sought to be annulled, the former requiring telephone companies to report to the city council their receipts, expenditures, and value of plant, and the latter fixing the rates to be charged by plaintiff for telephone service, confer upon the city of Los Angeles power to regulate charges for such service? Second. Was such power, if the city possessed it, bargained away by Ordinance No. 6,595, Exhibit B to the bill, which granted to M. A. King, plaintiff's assignor, the franchise under which plaintiff is now operating? This question is included in the next one, and a strictly logical arrangement would require its assignment there, but, on account of its importance, indeed pivotal character, I have given it a separate heading. Third. Do said ordinances, Exhibits C and D, contravene that clause of section 10 of article 1 of the Constitution of the United States, which forbids any state to pass a law impairing the obligations of contracts, or those provisions of the fourteenth amendment to said Constitution, which forbid a state to deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction the equal protection of the laws? These questions will be considered in the order in which they are propounded, and references hereafter to the ordinances attached to the bill will be by the letters which distinguish them respectively as exhibits.

1. That a state has power to regulate charges for telephone service is well settled (Munn v. Illinois, 94 U. S. 113, 24 L. Ed. 77; Chicago, etc., T. R. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94; Spring Valley W. Co. v. Schottler, 110 U. S. 347, 4 Sup. Ct. 48, 28 L. Ed. 173; R. R. Commission Cases, 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636; Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247; Hockett v. State, 105 Ind. 259, 5 N. E. 178, 55 Am. Rep. 201; Knoxville v. Knoxville W. Co., 107 Tenn. 650, 64 S. W. 1075, 61 L. R. A. 888); and it is equally well settled that this power may be delegated to municipalities (Des Moines Gas Co. v. Des Moines, 44 Iowa, 505, 24 Am. Rep. 756; People v. Suburban R. R.

Co., 178 Ill. 594, 53 N. E. 349, 49 L. R. A. 650; St. Louis v. Bell Telephone Co., 96 Mo. 623, 10 S. W. 197, 2 L. R. A. 278, 9 Am. St. Rep. 370; McQuillan on Municipal Ordinances, § 583; Danville v. Danville Water Co., 180 Ill. 233, 54 N. E. 224).

The remaining question for determination here is this: Was said power, at the times of the adoption of said ordinances, vested in the city of Los Angeles, by delegation from the state of California? Section 31 of the charter of said city, then and now in force, is as follows:

"Sec. 31. The council shall have power, by ordinance, to regulate and provide for lighting of streets, laying down gas pipes and erection of lamp posts, electric towers and other apparatus, and to regulate the sale and use of gas and electric light, and fix and determine the price of gas and electric light, and the rent of gas meters within the city, and regulate the inspection thereof, and to regulate telephone service, and the use of telephones within the city, and to fix and determine the charges for telephones and telephone service, and connections; and to prohibit or regulate the erection of poles for telegraph, telephone or electric wires in the public grounds, streets or alleys, and the placing of wires thereon; and to require the removal from the public grounds, streets or alleys of any or all such poles, and the removal and placing under ground of any or all telegraph, telephone or electric wires."

Plaintiff's contention, that the power conferred is only a power to fix and determine charges once for all, that is, permanently, by contract, cannot be sustained. Certainly no such limitation is expressed, nor can it be reasonably inferred. The words themselves, "fix and determine," when applied to rates, fairly import a continuing power of regulation. Atlantic & Pacific R. R. Co. v. U. S. (D. C.) 76 Fed. 186. The term "by ordinance" in said section is hardly appropriate to denote a contractual method for the exercise of the power it qualifies, but does suitably designate power of a legislative character. This view is strengthened by section 12 of article 3 of the city charter, which provides that:

"All legislative power of the city is vested in the council, subject to the power of veto and approval by the mayor, as hereafter given, and shall be exercised by ordinance; other action of the council may be by order upon motion."

If, however, the language of section 31 were ambiguous, the doubt should be resolved in favor of that construction which makes the power a continuous one. This precise question was authoritatively decided in the case next below cited, and a precedent more directly in point is rarely found. There the phraseology of the statute under consideration was, that the city council shall have power "to authorize any person or private corporation to construct and maintain the same [waterworks] at such rates as may be fixed by ordinance and for a period of not exceeding 30 years." The opinion in the case quotes a previous construction by the Supreme Court of Illinois, that "the meaning of this language is not that the waterworks are to be maintained at such established rate as may be fixed by one ordinance for a period not exceeding 30 years. The clause 'for a period not exceeding thirty years' qualifies the words 'construct and maintain the same' but does not qualify the words 'at such rate as may be fixed by ordinance,'" and then proceeds as follows:

"The statutes are certainly ambiguous, and in resolving the ambiguity in favor of the public the court applied the rule declared in many cases. We

said in the Railroad Commission Cases, 116 U. S. 307, 325, 6 Sup. Ct. 334, 342, 29 L. Ed. 636, by Chief Justice Waite, of the power of the regulation of rates:

" 'This power of regulation is a power of government, continuing in its nature, and if it can be bargained away at all it can only be by words of positive grant, or something which is in law equivalent. If there is reasonable doubt, it must be resolved in favor of the existence of the power. In the words of Chief Justice Marshall in Providence Bank v. Billings, 4 Pet. 514, 561, 7 L. Ed. 939, "Its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon does not appear." This rule is elementary, and the cases in our reports where it has been considered and applied are numerous.'

"These remarks are obviously applicable to the Illinois statutes. The question is whether the power given to the municipalities of the state was to be continuing or occasional, indeed only special in its purpose, intended to have but one exercise and then bound in contract for 30 years. If the latter had been the intention, it would have been natural to express it. The fullness of sovereignty can be taken for granted, and naturally would be and should be taken for granted. An example is afforded by the act of June 6, 1891. By that act the corporate authorities of any city, which have authorized or shall authorize any individual, company, or corporation to supply water, 'be and hereby are impowered to prescribe by ordinance maximum rates and charges for the supply of water furnished by such individual, company, or corporation. * * *' There is no explicit provision for repetitions of the power—none declaring the power conferred a continuing one. Who now doubts that it is? If rights were claimed and were pleading for a different interpretation, we might have to listen to them, but now undisturbed by them we yield without resistance to that meaning which the subject-matter demands in the absence of negativing words.

"Our conclusion is that the powers conferred by the statutes of 1872 can, without straining, be construed as distributive. The city council was authorized to contract with any person or corporation to construct and maintain waterworks 'at such rates as may be fixed by ordinance, and for a period not exceeding 30 years.' The words 'fixed by ordinance' may be construed to mean by ordinance once for all to endure during the whole period of 30 years, or by ordinance from time to time as might be deemed necessary. Of the two constructions, that must be adopted which is most favorable to the public, not that one which would so tie the hands of the council that the rates could not be adjusted as justice to both parties might require at a particular time." Freeport Water Co. v. Freeport, 180 U. S. 599, 21 Sup. Ct. 493, 45 L. Ed. 679.

The various reasons which plaintiff urges in detail against the applicability of said case to the one at bar are not convincing; while the claim, quoting from plaintiff's brief, "that the Freeport Case has been virtually overruled by the Supreme Court in the Detroit Street Car Case and the Cleveland Street Car Case, both of which cases were unanimously decided by the Supreme Court after the Freeport Case," is certainly untenable, in view of the fact that the opinion in the Detroit Case, which was written by Justice Peckham, one of the dissenting justices in the Freeport Case, cites approvingly the Freeport Case (Detroit v. Detroit Cit. St. Ry. Co., 184 U. S. 368–382, 22 Sup. Ct. 410, 46 L. Ed. 592), and the opinion in the Cleveland Case, which was written by Justice White, who wrote the dissenting opinion in the Freeport Case, cites approvingly the Detroit Case (Cleveland v. Cleveland C. Ry. Co., 194 U. S. 517–536, 24 Sup. Ct. 756, 48 L. Ed. 1102). The opinions in the Detroit and Cleveland Cases show that the Supreme Court had before it in each case the Freeport decision, and yet neither of the two last-mentioned justices expressed any

continuing dissent from the Freeport Case, but on the contrary Justice Peckham refers to said case with seeming approval.

So, also, plaintiff's contention that the Broughton act contemplates the fixing of rates only by contract for the whole term of the franchise directly conflicts with the rule and authority above enunciated and cited, and is therefore without merit.

Plaintiff's argument that such regulation, as an exercise of legislative power, cannot be a municipal affair, because it works unlawful discrimination between competing corporations, and violates subdivision 19, § 25, art. 4, and section 21, art. 1, of the state Constitution, and that equal protection of the law as to rates can be had only when by general statutes they are made uniform throughout the state, is not well grounded. The local conditions of public utilities, such as value of plant, costs of maintenance and operation, etc., are so variant in different places, that rates, if reasonable, cannot be the same in all localities. From this consideration, it follows that municipalities should be allowed respectively to fix rates within their corporate limits, and it was to promote and apply this salutary doctrine to all matters of local concern that the provisions of section 8, art. 11, of the Constitution, authorizing freeholders' charters, were ordained as organic laws. Uniformity is the very thing these charters are designed to avoid, and dissimilarity their essential idea.

The Supreme Court of California on this subject has said:

"It may be true, that the freeholder charter scheme confers greater influence in legislative matters upon the inhabitants of the favored cities than is enjoyed by the people who do not reside in said cities. The inhabitants of the favored cities may participate in making laws for others which have no operation at all as to them, while the outsider, when the charter has been once made, has no voice in making such laws for those within the city even when he is vitally and directly interested in them; but if this be an inequality the people have themselves made it, and if a remedy is needed they alone can provide it." People v. Williamson, 135 Cal. 415, 67 Pac. 504.

Nor is there anything contrary to these views in section 6, art. 11, of the Constitution, for the simple reason that the regulation of the charges of a public service corporation within the limits of a city is a "municipal affair." Streets of a city are public highways, in which the people of the whole state are interested, yet the opening and widening of streets are "municipal affairs." Byrne v. Drain, 127 Cal. 663, 60 Pac. 433. The regulation of telephone rates in a city would seem to be more clearly a matter of local concern than the control of streets. On this point plaintiff continues as follows:

"Our construction is reinforced by the consideration of other provisions of the same instrument. Section 33, art. 4, of the Constitution, provides: 'The Legislature shall pass laws for the regulation and limitation of the charges for services performed and accommodation furnished by telegraph companies, * * * and where laws shall provide for the selection of any person or officer to regulate or limit such rates, no such person or officer shall be selected by any corporation or individual interested in the business to be regulated, and no person shall be selected who is an officer or stockholder in any such corporation.' It is plain that by this provision it was not intended to regulate or limit the charges of telegraph companies except by general laws. State v. Mayor (Mont.) 85 Pac. 744."

Plaintiff, through inadvertence, erroneously quotes the first clause of said section, which is as follows:

"The Legislature shall pass laws for the regulation and limitation of the charges for services performed and commodities furnished by telegraph and gas corporations," etc.

The omitted words "and gas corporations" are very significant. If plaintiff's interpretation of the constitutional provision above quoted be correct, then gas corporations cannot be regulated or limited in their charges, except by general laws, whereas plaintiff shows that by section 19 of article 11 the fixing of gas rates is a municipal affair. Moreover, if there were no such constitutional provisions in reference to gas companies, it is manifest that the fixing of gas rates throughout the various cities of the state by a general law would be impracticable, and that it is a matter properly, if not necessarily, confided to the respective municipalities.

Plaintiff repeats its erroneous construction of said section as follows:

"Referring again to section 33 of article 4 of the Constitution of California above quoted, we desire to call the attention of the court to the fact that that section applies to telephone companies. The section refers only to telegraph companies, but telegraph companies and telephone companies stand upon the same footing, and the language used in constitutions and statutes referring to telegraph companies applies to and binds telephone companies. Joyce on Electric Law, § 8; Davis v. Pacific States Telephone Company, 127 Cal. 315, 59 Pac. 698. The foregoing California decision on the subject necessarily settles the construction of the above section of the Constitution. It is plain, therefore, that the framers of the Constitution regarded the regulation of telephone and telegraph charges as not a municipal affair, but provided that the same should be done by general and uniform laws, and evidently contemplated that it should be done by some sort of a commission. It is plain that the fixing of telephone rates cannot be a municipal affair, while the above provision of the Constitution of the state of California is in force. It clearly and distinctly requires the Legislature to pass the laws, and we think it would be a violation of the plain provisions of that section of the Constitution for the Legislature to divest itself of this power by delegating it to a municipal corporation."

No one will claim that it was ever contemplated by the Constitution that gas rates should be regulated by a general law, or through the agency of a commission; and the truth is section 33 of article 4 above quoted does not contemplate the accomplishment of its purposes by a general law, or through commissions, but by suitable delegations of power to municipalities. I am clearly of opinion that the city of Los Angeles, when said ordinances were adopted, was authorized by its charter and the Constitution of the state to regulate charges for telephone service, and that the authority thus conferred upon the city was as ample as that possessed by the Legislature, and that this conclusion results, even though the grant of said authority be considered solely as a delegation from the Legislature. There are strong reasons, however, for a broader and more liberal construction of a freeholders' charter than is usually given to a grant solely from the Legislature. The Supreme Court of the state has said:

"The power of cities under charters to raise money by taxation for municipal purposes does not find its source in any grant by the Legislature, but has been directly granted by the people of the state by the provisions of the Constitution." Ex parte F. W. Braun, 141 Cal. 204, 74 Pac. 780; Security Savings,

etc., Co. v. Hinton, 97 Cal. 214, 32 Pac. 3; Ex parte Pfahler (Cal. Sup.) 88 Pac. 270; St. Louis v. Dorr, 145 Mo. 466, 41 S. W. 1094, 46 S. W. 976, 42 L. R. A. 686, 68 Am. St. Rep. 575; St. Louis v. Western U. Tel. Co., 149 U. S. 467, 13 Sup. Ct. 990, 37 L. Ed. 810.

The power acquired by a municipality under a freeholders' charter, so far as concerns its interpretation, is not unlike that conferred by section 11 of article 11 of the state Constitution upon municipal corporations to pass local police and sanitary regulations, and it has been repeatedly held that in the latter case the power is a direct grant from the people and not merely an authority delegated by the Legislature. Ex parte Roach, 104 Cal. 272, 37 Pac. 1044; Ex parte Lacey, 108 Cal. 326, 41 Pac. 411, 38 L. R. A. 640, 49 Am. St. Rep. 93; Denninger. v. Recorder's Court, 145 Cal. 626, 79 Pac. 360; Odd Fellows Cam. Ass'n v. S. F., 140 Cal. 226, 73 Pac. 987. Such a charter being an organic act, and so declared by the Constitution, should not the powers of the city thereunder, like those of the Legislature of the state, be liberally interpreted? It is unnecessary, however, to pursue this line of thought further. Section 31 of the charter of the city of Los Angeles is so clear and unambiguous in conferring upon said city control of telephone rates that there is no occasion to invoke collateral aids to interpretation (McPherson v. Blacker, 146 U. S. 27, 13 Sup. Ct. 3, 36 L. Ed. 869), and therefore it is immaterial whether said charter be considered a grant by the Legislature or direct emanation from the people.

I am further of opinion that Ordinance C, requiring telephone companies to report to the city council value of plant, receipts, and expenditures, is an appropriate, if not necessary, means for carrying into effect the power of regulation conferred by section 31 of the charter, and therefore power to pass said ordinance is included in said power of regulation.

Plaintiff's claim that the power of regulation, if conferred, was given to the council as a commission representing the state, independent of the city, and that the council, as a commission, being without legislative power, could not lawfully pass Ordinance C, is untenable. Careful reading of all the sections of article 3 of the city charter satisfies me that the power to regulate rates conferred by section 31 of said article is given to the council not as a commission but as the legislative or governing body of the city. For instance, article 3 of the charter begins with the declaration, in section 12: "The legislative power of the city is vested in the council, subject to the power of veto and approval by the mayor as hereafter given and shall be exercised by ordinance; other action of the council may be by order upon motion." Then, following in its order, is the provision in section 31 of said article, authorizing the council to regulate rates as follows: "The council shall have power by ordinance * * * to fix and determine charges for telephones and telephone service," etc. Reading these sections together, it seems to me that there is no room for controversy, but that the powers conferred by section 31 were given to the council as the legislative or governing body of the city, and not as a commission. This view is not only shown, however, by a careful perusal and comparison of the various sections of

said article of the charter, but is confirmed by the authority which plaintiff itself cites to the opposite contention, namely, Jacobs v. Supervisors, 100 Cal. 121–130, 34 Pac. 630, 633. At the latter page, the court says:

"At the time the section was adopted there was no city and county or city or town other than the city and county of San Francisco of which a board of supervisors was the legislative department, and it may well be presumed that the constitutional convention at that time had particularly in view the city and county of San Francisco when they expressly granted to the board of supervisors the power to establish water rates. But as there were some, and might in the future be other, cities and towns of whose government boards of supervisors did and might not constitute a part, and as other consolidated city and county governments could be established in the future whose legislative department might or might not be boards of supervisors, it was necessary, also, to provide for the fixing of water rates in those kinds of municipalities. And so the section, after declaring that water rates 'shall be fixed annually by the board of supervisors' (that is, of course, when such board was or should be a part of the government), proceeded to provide, also, that in municipalities having no boards of supervisors the 'other governing body' thereof should fix the rates. It is difficult to conceive how any other construction can be put upon the section without entirely eliminating therefrom the prominent and conspicuous words 'board of supervisors.'"

It follows, from the foregoing views, that Ordinances C and D are both valid, unless the power of regulation conferred by the local laws upon the city had been previously surrendered by contract, or is in contravention of some provision of the federal Constitution, and these two questions will be considered in the order in which they have been named.

2. I now come to the second question propounded in the outset of this opinion, namely, did the city of Los Angeles, by Ordinance B, surrender or suspend its power to regulate plaintiff's charges for telephone service?

The power to abandon or suspend its control of rates is not expressly given the city of Los Angeles either by its charter or the Broughton act. St. California, 1901, p. 267, c. 103. It is argued, however, by plaintiff, that in this age telephone systems are among the appropriate instrumentalities for providing and maintaining suitable fire and police departments, and otherwise promoting the efficient administration of municipal government, and therefore the power to contract for telephone rates is inferable from sections 17, 22, and 23 of said charter. It is also argued on behalf of plaintiff that this power to contract for rates is to be implied from the Broughton act, providing for the sale of franchises, on the ground that a sale implies a price. It may well be doubted, however, whether or not authority to provide and maintain suitable fire and police departments, or the more comprehensive authority to efficiently administer the municipal government, as conferred by the city charter, or whether or not the sale of franchises as authorized and provided for by the Broughton act, necessarily or reasonably include authority to surrender municipal control over rates. These provisions of the charter and the Broughton act are unlike the charter provision in Los Angeles City Water Co. v. Los Angeles (C. C.) 88 Fed. 720, from which the court inferred power to fix rates contractually. There the express provision of the charter

was that the city council "shall have the power　＊　＊　＊　to provide for supplying the city with water."

It may be that whatever doubts arise on this question should, under the well recognized rule of construction hereinbefore referred to, be resolved against the claimed grant of power and favorably to its retention by the state. However, for the purposes of this hearing, it will be conceded, without further consideration or any decision of the question, that the city, when plaintiff's franchise was granted, had authority by contract to abridge or abandon its control of telephone rates, and it is therefore needless to inquire whether, in granting said franchise, it acted in a proprietary or legislative capacity, or derived its authority from charter provisions or general laws. It is important, however, to determine the character of the power to regulate rates, since this fixes the rule of construction applicable to cases where abandonment or suspension of the power is claimed.

. The power of the state to regulate public utilities, including rates, cannot be otherwise than a power of legislation. Where this power has been admittedly conferred upon a city, and the city adopts a suitable ordinance, in execution of this power, such an ordinance is not in any sense a proprietary matter. I can see merit, if not convincing force, in the proposition that a city, when it enters into a contract for a public utility, even though municipal control of rates be thereby abridged or abandoned, acts in a proprietary character, but this proposition by no means takes away from the power thus abandoned its governmental or legislative character. This distinction seems to be presented in the following quotation:

"The power to fix and to regulate the rates which the inhabitants of a city shall pay to business corporations for water, gas, transportation, and other public utilities partakes of the nature of a governmental power and also that of a business power. Are the inhabitants of a city paying rates not fixed by contract to quasi public corporations for public utilities? The power to so regulate these rates that they shall not be unreasonable is a legislative, a governmental power which the state or city may exercise, but may not renounce. Is a city without waterworks and hence without rates at which any one will furnish water therefrom to the municipality or its inhabitants? The making of a contract for the construction and operation of waterworks wherein the parties agree what rates may be collected by the owner of the works from private consumers during a reasonable term of years is the exercise of one of the business powers of the corporation. The purpose of such a contract is not to regulate rates, for there are no rates to regulate. Hence it is that the Legislature of a state, unless prohibited by its Constitution, may empower a city to suspend by contract, and a city may suspend in that way during a reasonable term of years, its power to change or regulate the rates which an individual or corporation may collect of private consumers." Omaha Water Co. v. Omaha, 147 Fed. 1, 5, 77 C. C. A. 267, 271.

In a leading case on this subject it is said:

"When one becomes a member of society, he necessarily parts with some rights or privileges which, as an individual not affected by his relations to others, he might retain. 'A body politic,' as aptly defined in the preamble of the Constitution of Massachusetts, 'is a social compact by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good.' This does not confer power upon the whole people to control rights which are purely and exclusively private (Thorpe v. R. & B. Railroad Co., 27 Vt. 143, 62 Am. Dec. 625); but it does authorize the establishment of laws requiring each citizen

to so conduct himself, and so use his own property, as not unnecessarily to injure another. This is the very essence of government, and has found expression in the maxim 'Sic utero tuo ut alienus non lædis.' From this source come the police powers, which, as said by Mr. Chief Justice Taney in the License Cases, 5 How. (U. S.) 583, 12 L. Ed. 256, 'are nothing more or less than the powers of government inherent in every sovereignty, * * * that is to say, * * * the power to govern men and things.' Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own property, when such regulation becomes necessary for the public good. In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum charge to be made for services rendered, accommodations furnished, and articles sold. To this day statutes are to be found in many of the states upon some or all of these subjects; and we think it has never yet been successfully contended that such legislation came within any of the constitutional prohibitions against interference with private property." Munn v. Illinois, 94 U. S. 124, 24 L. Ed. 77.

In another case a specific designation is made as follows:

"This power of regulation is a power of government continuing in its nature, and if it can be bargained away at all it can only be by words of positive grant or something which is in law equivalent." Railroad Commission Cases, 116 U. S. 325, 6 Sup. Ct. 334, 342, 29 L. Ed. 636.

In yet another case it is held, quoting from the syllabus:

"An act of the Legislature of New York (Laws 1888, p. 946, c. 581) provided that the maximum charge for elevating, weighing, and discharging grain should not exceed five-eighths of one cent a bushel; and that, in the process of handling grain by means of floating and stationary elevators, the lake vessels or propellers, the ocean vessels or steamships, and canal boats, should only be required to pay the actual cost of trimming or shoveling to the leg of the elevator when unloading, and trimming cargo when loading. Held, that the act was a legitimate exercise of the police power of the state over a business affected with a public interest, and did not violate the Constitution of the United States and was valid." Budd v. New York, 143 U. S. 517, 12 Sup. Ct. 468, 36 L. Ed. 247.

At page 534 of 143 U. S., and page 472 of 12 Sup. Ct. (36 L. Ed. 247), of the same case, appears the following:

"The opinion further said that the criticism to which the case of Munn v. Illinois had been subjected proceeded mainly upon a limited and strict construction and definition of the police power; that there was little reason, under our system of government, for placing a close and narrow interpretation on the police power, or restricting its scope so as to hamper the legislative power in dealing with the varying necessities of society and the new circumstances as they arise calling for legislative intervention in the public interest; and that no serious invasion of constitutional guarantees by the Legislature could withstand for a long time the searching influence of public opinion, which was sure to come sooner or later to the side of law, order, and justice, however it might have been swayed for a time by passion, prejudice, or whatever aberrations might have marked its course. We regard these views which we have referred to as announced by the Court of Appeals of New York, so far as they support the validity of the statute in question, as sound and just."

In a still later case, the Supreme Court, referring to the matter of rates, said:

"These acts are urged to establish the power in the village of Rogers Park to grant to the plaintiff in error the right to charge and collect for 30 years the rates prescribed by the ordinance of November, 1888. * * * A strict construction must be exercised. The contract claimed concerned governmental

functions, and such functions cannot be held to have been stipulated away by doubtful or ambiguous provisions." Rogers Park Water Co. v. Fergus, 180 U. S. 624–629, 21 Sup. Ct. 490, 491, 45 L. Ed. 702.

From the foregoing excerpts it is manifest that the Supreme Court classifies the power to regulate rates as governmental and falling within the police powers of the state. Nor does Los Angeles City Water Co. v. Los Angeles (C. C.) 88 Fed. 721, hold anything to the contrary; but, after quoting from a line of decisions which treat the power in question as proprietary, the court there says:

"If, however, it be conceded, contrary to these authorities, and as claimed by defendants, that the power of the city to regulate water rates is legislative or governmental, the city may by contract abridge such power under an implied as well as an express legislative grant, and this rule is recognized in many of the authorities upon which defendant relies."

In the Los Angeles Case there was no dispute but that the city had entered into a contract which limited its power to regulate rates, and the court held that, conceding this power to be legislative, still it was competent for the city to bargain it away. Plaintiff's syllogism, substantially as follows: Police power cannot be bartered away. Power to regulate rates may be surrendered by contract. Therefore, power to regulate rates is not a police power—is manifestly unsound in its first premise. It has been authoritatively and repeatedly held that powers of sovereignty may be contractually abandoned. In the earliest case on this subject it is clearly implied that even the sovereign power of taxation may be thus surrendered; the court saying:

"That the taxing power is of vital importance, that it is essential to the existence of the government, are truths which it cannot be necessary to reaffirm. They are acknowledged and asserted by all. It would seem that the relinquishment of such a power is never to be presumed. We will not say that a state may not relinquish it, that a consideration sufficiently valuable to induce a partial release of it may not exist; but, as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear." Providence Bank v. Billings, 29 U. S. 514, 560, 7 L. Ed. 936.

So, too, the police power of the state may be surrendered or abridged by contract, if the contract be not prejudicial to the peace, good order, health, or morals of its inhabitants. This qualification is stated by a case cited by plaintiff as follows:

"The argument that the contract is void as an attempt to barter away the legislative power of the city council rests upon the assumption that contracts for supplying a city with water are within the police power of the city, and may be controlled, managed, or abrogated at the pleasure of the council. This court has doubtless held that the police power is one which remains constantly under the control of the legislative authority, and that a city council can neither bind itself, nor its successors, to contracts prejudicial to the peace, good order, health or morals of its inhabitants; but it is to cases of this class that these rulings have been confined." Walla Walla v. Walla Walla Water Co., 172 U. S. 1–15, 19 Sup. Ct. 77, 83, 43 L. Ed. 341.

The police powers, however, include other subjects than those enumerated, and, as said in Munn v. Illinois, supra:

"Under these powers the government regulates the conduct of its citizens one towards another, and the manner in which each shall use his own prop-

erty, when such regulation becomes necessary for the public good. In their exercise it has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, etc., and in so doing to fix a maximum charge to be made for services rendered, accommodations furnished, and articles sold."

The Walla Walla Case above referred to, so far from holding that regulation of rates is not a police power, holds that where a contract is itself innocuous it may be sustained, even though it abridges the police power. Thus, at page 16 of 172 U. S., and page 84 of 19 Sup. Ct. (43 L. Ed. 341), the court says:

"Under this power and the analogous power of taxation we should have no doubt that the city council might take such measures as were necessary or prudent to secure the purity of the water furnished under the contract of the company, the payment of its just contributions to the public burdens, and the observance of its own ordinances respecting the manner in which the pipes and mains of the company should be laid through the streets of the city. New York v. Squire, 145 U. S. 175, 12 Sup. Ct. 880, 36 L. Ed. 666; St. Louis v. Western Union Tel. Co., 148 U. S. 92, 13 Sup. Ct. 485, 37 L. Ed. 380; Laclede Gas Light Co. v. Murphy, 170 U. S. 78, 18 Sup. Ct. 505, 42 L. Ed. 955. But where a contract for a supply of water is innocuous in itself and is carried out with due regard to the good order of the city and the health of its inhabitants, the aid of the police power cannot be invoked to abrogate or impair it."

The same distinction is recognized in another quotation at page 24 of plaintiff's brief, as follows:

"I may add that a law for the purpose of securing and enforcing fair and reasonable charges by common carriers is not to be classed with those laws making for the public health and public morals, the power to enact which cannot be contracted away or parted with by the state." Central Trust Co. v. Citizens Street Ry. Co. (C. C.) 82 Fed. 1–8.

I am clearly of opinion, both upon reason and authority, that control of rates is distinctively a police power of the state. Indeed the decisions of the Supreme Court are conclusive of the question. Such being the character of the power, the rule of construction applicable to cases where parties claim its abandonment or suspension is easily ascertained. The Supreme Court has said:

"This power of regulation is a power of government continuing in its nature; and, if it can be bargained away at all, it can only be by words of positive grant, or something which is in law equivalent. If there is a reasonable doubt, it must be resolved in favor of the existence of the power. In the words of Chief Justice Marshall in the case of Providence Bank v. Billings, 4 Pet. 514–561, 7 L. Ed. 939, 'its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon it does not appear.' This rule is elementary, and the cases in our reports where it has been considered and applied are numerous." Stone v. Farmers' Loan & T. Co., 116 U. S. 307, 6 Sup. Ct. 334, 388, 1191, 29 L. Ed. 636.

Again, it has been said:

"Grants of immunity from legitimate governmental control are never to be presumed. On the contrary, the presumptions are all the other way, and, unless an exemption is clearly established, the Legislature is free to act on all subjects within its general jurisdiction, as the public interests may seem to require. As was said by Chief Justice Taney, speaking for the court, in Charles River Bridge v. Warren Bridge, 11 Pet. (U. S.) 547, 9 L. Ed. 773, 938; 'It can never be assumed that the government intended to diminish its power

of accomplishing the end for which it was created.' This is an elementary principle." Ruggles v. Illinois, 108 U. S. 526, 2 Sup. Ct. 832, 27 L. Ed. 812.

See, also, Freeport Water Co. v. Freeport, 180 U. S. 587, 21 Sup. Ct. 493, 45 L. Ed. 679; Danville Water Co. v. Danville, 180 U. S. 619, 21 Sup. Ct. 505, 45 L. Ed. 696; Rogers Park Water Co. v. Fergus, 180 U. S. 624, 21 Sup. Ct. 490, 45 L. Ed. 702; Atlantic & Pacific R. R. Co. v. U. S. (D. C.) 76 Fed. 186.

Bearing in mind the rule of construction applicable to contracts which are claimed to abandon or suspend governmental control of rates, let us now examine Ordinance B, granting to plaintiff's assignor its franchise. The ordinance is entitled as follows:

"An ordinance granting to M. A. King and his assigns the right for a period of fifty years, to construct, maintain and operate conduits and wires," etc., "for the purpose of transmitting sound, signals, conversation, and intelligence by means of electricity and carrying on a general telephone business, together with certain appurtenant and incident rights."

The ordinance then proceeds as follows:

"Section 1. That the right, privilege and franchise is hereby granted to M. A. King and his assigns, to construct, lay down, maintain and operate for the period of fifty years an underground conduit and wires. * * *

"And to transmit sound, signals, conversation and intelligence through and over said wires by means of electricity, together with the right to construct, operate and maintain all necessary feeders, service wires, house connections and such other apparatus and appliances in connection therewith as may be necessary for the purpose of safely and efficiently operating and maintaining said conduit, poles and wires, and carrying on a general telephone business by means thereof. * * *"

Section 9 of the ordinance provides, among other things:

"That the rent or charge for unlimited, independent, metallic circuit, telephone service in the system established or maintained under said franchise so long as said system does not connect and exchange with more than 10,000 telephones, shall not exceed $60.00 per annum for a telephone installed in any business office or premises, or $30.00 per annum for a telephone installed in a private residence, and that when said system shall comprise more than 10,000 telephones, the annual rental or charge for the aforesaid services shall not be increased by more than a sum equal to $6.00 per annum for each one thousand telephones in said city connected with said telephone system in excess of 10,000."

Is it true that, by the provisions of said section of said ordinance, the city of Los Angeles abandoned, for 50 years, its right to reasonably limit plaintiff's charges for telephone service? Can it be said that the abandonment of the power in question has been "shown by clear and unambiguous language, which will admit of no reasonable construction consistent with the reservation of the power"? Certainly there is no express abandonment, and the circumstances of this case, particularly the long period of 50 years, forbid an implication of that sort. I do not mean to assert that, if a contract unequivocally abandoned a legislative power for 50 years, the duration of the abandonment would itself avoid the contract; but what I do say is that such a long period is a strong, if not conclusive, reason why an abandonment should not be implied.

The Supreme Court of Illinois, in a case very similar to this one, said:

"The village exercised the power by incorporating in the ordinance a scale of prices as being just and reasonable maximum rates to be paid to the company by the consumer of water. This provision of the ordinance had no effect to establish a contract between the appellant company and the village that the individual inhabitants should and would pay such rates for the period of 30 years, or any fixed period of time, but was simply a declaration on the part of the village that such rates were reasonable. The legal effect was to establish, prima facie, the corporation, in order to discharge the duty it owed to the public, must supply the commodity it had been created to supply at the prices named in the ordinance. It was a mode of regulating and enforcing the discharge of a legal duty—not a proposition looking toward a contract. No contract was necessary to create an obligation on the part of the corporation to supply water at a reasonable rate, for that rested upon it as a duty. Nor did the fixing of rates by the alleged ordinance of the village of Rogers Park vest in the appellant company an irrevocable right to exact such rates for the period it had been granted permission to occupy the streets, alleys, and public places of the village, or for any fixed period. A rate or price reasonable and just when fixed may, in the future, become so unreasonably high that the exaction of such rate or price is but an extortion. The duty of the corporation does not, however, change, but remains the same—that is, to exact only reasonable compensation. The power of the state to enforce that duty is not exhausted by its exercise in the first or any subsequent instance, but is continuous, and may be exerted from time to time, whenever necessary to prevent extortion by the agency created by the state to serve the public." Rogers Park Water Co. v. Fergus, 178 Ill. 571–578, 53 N. E. 363, 365.

Furthermore, section 9 of Ordinance B is not a grant, but a limitation. The franchise granted in the first section to construct a telephone system and carry on a general telephone business necessarily implies a right to charge reasonable rates for telephone service (Winona, etc., Co. v. Blake, 94 U. S. 180, 24 L. Ed. 99), and section 9 is but a limitation upon this right. It confers nothing, but simply qualifies what has already been conferred. It does not give any right whatever to the plaintiff, much less a right to charge up to the maximum rate, for 50 years, but is simply a legislative declaration that any charge in excess thereof would at that time be unreasonable. This distinction and its consequences are amplified in Atlantic & Pacific R. R. Co. v. United States, supra, and, after careful reconsideration of the opinion in that case, which was written by myself, I am satisfied with the principles it enunciates, and their application to the case at bar can but lead to the conclusion that section 9 of Ordinance B is not nor was it intended as a covenant surrendering the city's control of rates.

Plaintiff states its opposing contention, in general terms, thus: "A franchise which has fixed maximum rates for the services to be rendered thereunder is a contract as to the rate, and the rate cannot be reduced." I shall not undertake a full review of the cases cited by plaintiff to this contention, but will briefly notice some of them.

Stone v. Yazoo & Mississippi R. R. Co., 62 Miss. 607, 52 Am. Rep. 193, does not sustain the contention, as appears from the first clause of plaintiff's quotation from the case, which is as follows:

"Section 6 of the charter of the appellee confers on the company power to fix from time to time, by its board of directors, the rates at which it will transport person or property over its railroad, provided they shall not exceed the maximum specified in the act."

Thus it will be seen that the right of the company to fix its rates was not an implication from the maximum rate prescribed, but was expressly conferred.

State v. Laclede Gas Co., 102 Mo. 472, 14 S. W. 974, 15 S. W. 383, 22 Am. St. Rep. 789, although somewhat different in its facts from the case at bar, seems to favor plaintiff's contention. Pingree v. Michigan Central Ry. Co., 76 N. W. 635, 118 Mich. 314, 53 L. R. A. 274, was also decided upon its own peculiar facts, many of which do not exist in the case at bar. The opinion is a long one, and, in order to be properly understood, must be carefully read. Two excerpts from the opinion, however, will clearly show that the mere fixing of a maximum rate does not give a right to charge up to that rate, but such right can exist only where there are other expressions or circumstances, in connection with the maximum rate, showing unequivocally an intent to confer such right. At page 640 of 76 N. W., and page 330 of 118 Mich. (53 L. R. A. 274), the court says:

"It was not, then, a general grant of power, and therefore limited to fixing rates, the reasonableness of which should be determined by the usual methods, and consequently the same power as any individual or corporation would have without it, but was intended to confer a contract right to fix tolls, within the limit of three cents a mile, as plainly as though it had provided that said road should have the right to charge three cents a mile, or less, in its discretion, for transportation of passengers. It will be noticed in the cases cited that in no case where a maximum rate was fixed has the right of the company to fix tolls to that amount been denied. This case is even stronger than such, inasmuch as the charter expressly fixes the limitation, and unqualifiedly states that such shall be the only limitation of the company's power."

Again, at page 642, 76 N. W., and page 335 of 118 Mich. (53 L. R. A. 274), the court says:

"It is noticeable that in the present case we do not 'find the section granting the power to fix rates by by-law in the same section that declares that by-laws shall not be in conflict with the laws of the state,' nor do we find a mere general authority to fix rates, nor a mere mention of a maximum rate."

It should be observed here, however, that the statement of the court in said quotation, "it will be noticed in the cases cited that in no case where a maximum rate was fixed has the right of the company to fix toll in that amount been denied," is manifestly erroneous, because maximum rates were prescribed, and the right of the company to fix tolls to that amount was denied in Banking Company v. Smith, 128 U. S. 174, 9 Sup. Ct. 47, 32 L. Ed. 377.

Borough v. Whitehaven W. Co., 58 Atl. 159, 209 Pa. 166, so far from supporting plaintiff's contention, treats the maximum rate prescribed as a limitation upon, not the grant of a right, and is in perfect accord with the views I have expressed.

Chicago R. R. Co. v. Iowa, 94 U. S. 155, 24 L. Ed. 94, affords no support to plaintiff's contention. The full paragraph from which plaintiff quotes is as follows:

"This company, in the transaction of its business, has the same rights, and is subject to the same control, as private individuals under the same circumstances. It must carry when called upon to do so, and can charge only a reasonable sum for the carriage. In the absence of any legislative regulation upon the subject, the courts must decide for it, as they do for private persons, when controversies arise, what is reasonable. But when the Legislature

steps in and prescribes a maximum of charge, it operates upon this corporation the same as it does upon individuals engaged in a similar business. It was within the power of the company to call upon the Legislature to fix permanently this limit, and make it a part of the charter; and, if it was refused, to abstain from building the road and establishing the contemplated business. If that has been done, the charter might have presented a contract against future legislative interference. But it was not, and the company invested its capital, relying upon the good faith of the people and the wisdom and impartiality of the legislators for protection against wrong under the form of legislative regulation."

All that the court decides in this paragraph is that, if the Legislature had fixed "permanently" a maximum limit in the charter, it might have been a contract against future legislative interference. Indeed, the language of the court implies that the mere fixing of a maximum limit is not a provision against future legislative control, but that, in order to effect this result, the maximum limit must be prescribed permanently in terms.

In Detroit v. Detroit R. R. Co. (C. C.) 60 Fed. 161, the only pertinent fact is found at page 171, as follows:

"By section 8 of the ordinance of 1862 it was provided 'the rate of fare for any distance shall not exceed 5 cents on any one car or on any one named in this ordinance.' "

Whether this section should be construed as a grant, which was the final conclusion of the court, or a limitation, which was the court's first impression, depends largely upon other facts of the case, which do not appear, and I am therefore unable to determine its applicability or force here.

City of Indianapolis v. Central Trust Co. of New York, 83 Fed. 529, 27 C. C. A. 580, simply decides that the plaintiff in good faith claimed a vested contract right to charge a higher rate of fare than that fixed in the ordinance assailed, and that therefore the court had jurisdiction of the case.

Moreover, it is to be inferred from the statement of facts that the ordinance fixing the maximum was passed pursuant to a statute of the state which gave power to the street railway company "to make by-laws among other things for regulating the running of the cars and the rate of fares on the road." If this inference be correct, then it was the statute which gave the power to the company to fix the rates, while the ordinance which prescribed the maximum was but a limitation on that power.

Detroit v. Detroit Cit. Ry. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, is widely and readily distinguishable from the case at bar. The court there held that the rate provisions gave the company a contractual right to charge up to the maximum, on the ground that the ordinance was passed under and pursuant to an act of the Legislature, which expressly directed the parties, that is, the city and the street railway company, to fix rates by agreement. The opinion of the court shows that the meaning it gave to the language fixing maximum rates was demanded by the peculiar circumstances of the case, and that the same language, under other circumstances, would call for a different construction. This idea the court emphasizes as follows:

"It may very well be that language used by a Legislature in merely conferring authority upon a company to fix certain charges for fare might not

be regarded as amounting to a contract, when the same language used by parties in fixing rates under a legislative authority and direction to agree upon them would be regarded as forming a contract, because the statute provided specially for that mode of determining them."

The Supreme Court, in a later case, where the provision as to a maximum rate was that "said company will supply private consumers with water at a rate not to exceed 5 cents per 100 gallons," said:

"The trouble at the bottom of the company's case is that the supposed promise of the city on which it is founded does not exist. If such a promise had been intended it was far too important to be left to implication. In form the words of this part of the instrument are the words of the company alone. They occur in the part of the contract which sets forth the company's undertakings, not in the part devoted to the promises of the city or in that which contains the still later mutual agreements. See Georgia Railroad & Banking Co. v. Smith, 128 U. S. 174, 9 Sup. Ct. 47, 32 L. Ed. 377; Ragan v. Aiken, 9 Lea, 609, 42 Am. Rep. 684. They are words of a company which was notified by the act which called it into being of the power expressly conferred upon the city 'by ordinance to regulate the price of water' which the company might supply. People who have accepted, as experience shows that people will accept, a charter subject to such liabilities, cannot complain of them or repudiate them, nor can the company which they have formed. Rockport Water Co. v. Rockport, 161 Mass. 279, 37 N. E. 168. This consideration answers a portion of the company's argument as to its rights under the fourteenth amendment, and makes it unnecessary to consider whether the regulation of water rates is properly to be classed as a police power. It also reinforces our interpretation of the instrument upon which the company founds its claim. We do not mean that under other circumstances words which on their face only express a limit might not embody a contract more extensive than their literal meaning. Detroit v. Detroit Citizens' Street Ry. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592. But in that case the rate was fixed by an ordinance which was the language of the city, the ordinance was under a statute which declared that the rates should be established by agreement between the city and the railway company, and neither statute nor ordinance reserved a power to the city to alter rates. In the present case it seems to us impossible to suppose that any power to contract which the city may have had was intended to be exercised in such a way as to displace the municipal power expressly reserved or given by the general law under which the water company was created. It would require stronger words than those used here to raise the question whether, under the statutes in force, the city could do it if it tried. The contracts fixing prices authorized by the statute were contracts between the company and its consumers, not, as in the case of the railway company, a single contract between the company and the city, and were subject to the power to regulate them given to the city by the same statute. We assume that the charter of the city authorized it to contract, but it was not so specific as the statute which we have quoted, and added nothing to the power conferred by that law." Knoxville Water Co. v. Knoxville, 189 U. S. 434–436, 23 Sup. Ct. 531, 532, 47 L. Ed. 887.

Not only does this last quotation confirm the views which I have expressed of the Detroit Case, but distinguishes it from Georgia Banking Company v. Smith, 128 U. S. 174, 9 Sup. Ct. 47, 32 L. Ed. 377, which holds, in substance, that the mere fixing of a maximum rate is not a surrender of the power of future regulation. The rate provision in the latter case was as follows:

"Provided, that the charge of transportation or conveyance shall not exceed 50 cents per 100 pounds, on heavy articles, and 10 cents per cubic foot on articles of measurement, for every 100 miles; and 5 cents per mile for every passenger."

And the court said:

"The question then arises whether there is in the twelfth section of the charter of the plaintiff in error a contract that it may make any charges within the limits there designated. * * * It does not matter in the present case whether the term be construed as imposing a condition on the preceding exclusive grant to the company of the privilege of transporting passengers and merchandise over its own roads, or be considered merely as a conjunction to an independent paragraph, declaring a limitation upon the charges which the company may make. If considered as a condition to the enjoyment of the exclusive right designated, then the section only provides that, so long as the maximum of rates specified is not exceeded, the company or its lessee shall have the exclusive right to carry passengers and merchandise over its roads. It contains no stipulation, nor is any implied, as to any future action of the Legislature. If the exclusive right remain undisturbed, there can be no just ground of complaint that other limitations than those expressed are placed upon the charges authorized. It would require much clearer language than this to justify us in holding that, notwithstanding any altered conditions of the country in the future, the Legislature had, in 1883, contracted that the company might, for all time, charge rates for transportation of persons and property over its line up to the limits there designated. It is conceded that a railroad corporation is a private corporation, though its uses are public, and that a contract embodied in terms of its provisions, or necessarily implied by them, is within the constitutional clause prohibiting legislation impairing the obligations of contracts. If the charter in this way provides that the charges, which the company may make for its services in the transportation of persons and property, shall be subject only to its own control up to the limit designated, exception from legislative interference within that limit will be maintained. But to effect this result, the exemption must appear by such clear and unmistakable language that it cannot be reasonably construed consistently with the reservation of the power by the state. There is no such language in the present case. The contention of the plaintiff in error therefore fails, and the judgment must be affirmed."

Cleveland v. Cleveland Street Ry. Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102, cannot justly be considered a precedent here, since most of the facts on which the decision turned are absent from the case at bar. For instance, the court there said:

"It is undoubtedly true that, immediately before and for a long time prior to the passage of the ordinances concerning the various consolidations and extensions referred to, the respective roads affected thereby were charging a cash fare of five cents over their respective lines, and that the effect of the consolidations and extensions was to secure to the public the benefit of a cash fare of five cents over the whole length of the consolidated and extended lines."

Again, the court says:

"The statutes show that there was lodged by the Legislature of Ohio in the municipal council of Cleveland comprehensive power to contract with street railway companies in respect to the terms and conditions upon which such roads might be constructed, operated, extended, and consolidated; the only limitation upon the power being that in case of an extension or consolidation no increase in the rate of fare should be allowed."

In the case at bar, the power to contract, if it exists at all, is but an implied power, and cannot justly be called a "comprehensive power," such as that described in the above quotation.

In the Cleveland Case it was specifically provided:

"That for a single fare from any point to any point on the line or branches of the consolidated road no greater charge than five cents shall be collected, and that tickets at the rate of 11 for 50 cents or 22 for one dollar shall at all times be kept for sale on the cars by conductors."

155 F.—37

The clause, "and that tickets at the rate of 11 for 50 cents or 22 for one dollar shall at all times be kept for sale on the cars by conductors," aids somewhat in giving to the rate provision a contractual character; the words "at all times" signifying the life of the franchise, 25 years.

Again, in the Cleveland Case, the court further says:

"The acceptance of this ordinance by the railroad companies affected thereby was required to be in writing and filed with the city."

Again, the court, in that case, said:

"Like provisions were contained in the ordinance of April 8, 1887, authorizing the laying of an additional track and the extension of the lines of the Woodland Avenue & West Side Street Railroad Company, and there was also a declaration, following the authorization of the extension and the rates to be charged on the whole line, that 'the right herein granted shall terminate with the present grant of the main line, to wit, on the 10th day of February, 1908.' The ordinance of August 12, 1887, authorizing a further extension, and the ordinance of June 20, 1892, authorizing the double tracking of a portion of the line, contained similar language."

The clause, "and there was also a declaration, following the authorization of the extension and the rates to be charged on the whole line, that 'the right herein granted shall terminate with the present grant of the main line, to wit, on the 10th day of February, 1908,'" was evidently a circumstance of much weight in the mind of the court; since "the right" which was to terminate on the 10th day of February, 1908, related both to "the authorization of the extension and the rates to be charged on the whole line," that is to say, "the right" granted, included the matter of rates as well as the extension of the road. Furthermore, this right was to terminate in a specific time, 25 years, or, differently expressed, was to continue for that period.

None of the foregoing circumstances are found in the case at bar; and not only are they made prominent by the court in stating the material facts of the Cleveland Case, but the court, in its summary, presumably to the end, that there might be no mistake or doubt as to the grounds of its decision, and that it might not thereafter be improperly invoked as a precedent, emphasizes said facts as among the controlling circumstances of the case in the following unequivocal language:

"In reason, the conclusion that contracts were engendered would seem to result from the fact that the provisions as to rates of fare were fixed in ordinances for a stated time and no reservation was made of a right to alter, that by those ordinances existing rights of the corporations were surrendered, benefits were conferred upon the public, and obligations were imposed upon the corporations to continue those benefits during the stipulated time. When, in addition, we consider the specific reference to limitations of time which the ordinances contained, and the fact that a written acceptance by the corporations of the ordinances was required, we can see no escape from the conclusion that the ordinances were intended to be agreements binding upon both parties definitely fixing the rates of fare which might be thereafter charged. Taking all the circumstances above referred to into account, the case before us clearly falls within the rule as to the binding character of agreements respecting rates applied in Detroit v. Detroit Citizens' Street Railway Company, 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, and approvingly referred to in Knoxville Water Co. v. Knoxville, 189 U. S. 434, 437, 23 Sup. Ct. 531, 47 L. Ed. 887."

The court looked not merely to one or two of said facts, but was careful to say:

"Taking all the circumstances above referred to into account, the case before us clearly falls within the rule as to the binding character of agreements respecting rates applied in Detroit v. Detroit Citizens' Street Railway Company, 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, and approvingly referred to in Knoxville Water Co. v. Knoxville, 189 U. S. 434, 437, 23 Sup. Ct. 531, 47 L. Ed. 887."

Another difference of great importance between the Cleveland Case and the one at bar is that in the Cleveland Case the suspension of the power of regulation was for only 25 years. In the case at bar, the suspension, if held to exist, would be for the period of 50 years. Indeed, this distinction applies to all of the cases cited in this connection except the Freeport Case, where the existence of a contract for rates was denied, and it is worthy of note that plaintiff, in its brief, states that the period of suspension in the Freeport Case, 55 years, was an unreasonable time. It is also worthy of notice that in the Cleveland Case the court refers approvingly to the Knoxville Case, wherein, as I have already shown, it was held that the mere fixing of maximum rates did not displace the municipal power of regulation given by the general law, under which the water company was created. Furthermore, there is no provision in section 9 of Ordinance B as to when the maximum rates there prescribed shall terminate, or how long they shall last. This becomes more noticeable when we read in the same connection the first clause of section 11 of Ordinance B:

"That the person to whom this franchise is granted, or his assigns, shall, during the life of said franchise pay to the city of Los Angeles in lawful money of the United States two per cent. of the gross annual receipts of such grantee and his assigns, arising from the use, operation or possession of said franchise."

Thus, it will be seen that section 11 expressly provides that 2 per cent. of the gross annual receipts of the company shall be paid to the city "during the life of said franchise," whereas the provisions of section 9 as to rates are not fixed, as they were in the Cleveland Case, for a stated time.

It is true that the city by Ordinance B required plaintiff to furnish for the use of the city 30 telephones and 150 pairs of conductors, and to pay to the city 2 per cent. of its gross annual receipts, and these things were doubtless considered an adequate consideration for the franchise granted plaintiff to use the public streets and alleys for the construction and operation of plaintiff's telephone system; but I find no case which supports plaintiff's contention that such a consideration alone is sufficient to show that the city, besides granting the use of the public streets and alleys, intended also to contract as to rates, thus abandoning its control of plaintiff's charges for the unusual period of half a century.

A somewhat elaborate review of the cases, including those above cited, bearing upon the point now under consideration, has been made by the Circuit Court of Appeals of the Eighth Circuit, in a case wherein the court, on grounds substantially the same as in the case of Detroit v. Detroit Citizens' Ry. Co., supra, held that there was a suspension

of the power to regulate rates. Omaha Water Co. v. Omaha, 147 Fed. 1, 77 C. C. A. 267.

After much reflection upon the subject, and a careful review of the authorities, I can but conclude that the city of Los Angeles did not, by Ordinance B, abandon or suspend its power to regulate charges for telephone service.

3. My ruling, just announced, that there was no contract as to rates between the city and the plaintiff, disposes of the latter's contention that Ordinance D violates what is known as the impairment clause of the Constitution.

Plaintiff's kindred contention that said ordinance violates the fourteenth amendment seems to be rested on the ground that "equal protection of the laws," within the meaning of said amendment, so far as rates are concerned, is afforded only where the rates are fixed uniformly throughout the state by general laws, and on the further ground that Ordinances D and E, which prescribe different rates for two companies, operating in said city, unlawfully discriminate against plaintiff, and that since Ordinance D makes no provision for notice, it would, if executed, deprive plaintiff of property without due process of law.

The first of these grounds has already been considered, the others will now receive attention.

A moment's reflection shows that the mere fact that different rates are prescribed for two companies does not, of itself, establish unlawful discrimination against either. Such discrimination can result from different rates only where the companies are identical as to those factors which determine just compensation, among them being value of plant, revenues, and expenditures. San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 633, 38 L. R. A. 460, 62 Am. St. Rep. 261. These conditions are rarely, if ever, the same in any two companies, and it is obvious that a rate fair to one company might be very unfair to another. To obtain relief on said ground, it is not sufficient to allege discrimination in general terms, but the facts out of which the discrimination grows must be clearly and specifically shown.

Moreover, Ordinance C, whose validity I have already shown, was intended to place before the city council such information as would enable it to do full justice to the plaintiff in the matter of rates. In paragraph 14 of the bill of complaint it is expressly alleged that plaintiff has not complied and declines to comply with said ordinance. Thus it appears that plaintiff has intentionally refused to do that which the law expressly enjoins, namely, furnish the information required by said ordinance, and for the lack of which the unlawful discrimination, if any, presumably resulted. Plaintiff will not be heard to complain in equity of a condition of things brought about by its own willful omission of duty.

It should be remembered, in this connection, that the reasonableness or unreasonableness of the rates fixed by Ordinance D is not before the court, but the only question is whether or not the city had power to fix any rate. In order to raise the question of reasonableness, it would be incumbent upon the plaintiff to allege, as I have already indicated, the particular facts on which the claim of unreasonableness rests.

Covington, etc., Turnpike Co. v. Sanford, 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560; Atlantic & Pacific R. R. Co. v. U. S. (D. C.) 76 Fed. 186; Redlands, etc., Water Co. v. Redlands, 121 Cal. 365, 53 Pac. 843; San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 633, 38 L. R. A. 460, 62 Am. St. Rep. 261. As stated above, however, plaintiff's contention is not that the rates fixed by the city in Ordinance D are so low as to be oppressive, but that the maximum rate fixed in Ordinance B is unalterable for a period of 50 years.

The other ground on which plaintiff bases its claim of an infraction of the fourteenth amendment, namely, that the Ordinance D does not provide for notice, is equally untenable. Said ordinance, being, as I have already held, legislative in character, no notice of intention to pass or consider it was required. Moore v. Haddonfield, 62 N. J. Law, 386, 41 Atl. 946; Cleveland, C., C. & St. L. R. R. Co. v. St. Bernard, 19 Ohio Cir. Ct. R. 299, 10 O. C. D. 415. On this subject of notice the Supreme Court of California has said:

"Whether the fixing of rates by the council be called a legislative, a judicial, or an administrative act, it is certainly not an adversary judicial proceeding, such as, under the Constitution, will conclude private rights. It is a proceeding on the part of the government to which neither the water company nor the rate payers are parties, conducted without notice to them, and without any right on their part to effectually intervene." San Diego Water Co. v. San Diego, 118 Cal. 556, 50 Pac. 633, 38 L. R. A. 460, 62 Am. St. Rep. 261.

To the same effect is the case of Water Works v. San Francisco, 82 Cal. 286–315, 22 Pac. 910, 1046, 6 L. R. A. 756, 16 Am. St. Rep. 116.

The Supreme Court of the United States has also declared notice unnecessary, in the following language:

"Was the appellant entitled to formal notice as to the precise day upon which the water rates would be fixed by ordinance? We think not. The Constitution itself was notice of the fact that ordinances or resolutions fixing rates would be passed annually in the month of February in each year and would take effect on the 1st day of July thereafter. It was made by statute the duty of the appellee at least 30 days prior to the 15th day of January in each year to obtain from the appellant a detailed statement, showing the names of water rate payers, the amount paid by each during the preceding year, and 'all revenues derived from all sources,' and the 'expenditures made for supplying water during said time.' It was the right and duty of appellant in January of each year to make a detailed statement, under oath, showing every fact necessary to a proper conclusion as to the rates that should be allowed by ordinance. Act of March 7, 1881 (Laws 1881, p. 54, c. 52) § 2, above cited. Provision was thus made for a hearing in an appropriate way. The defendant's board could not have refused to have duly considered it and given it proper weight in determining rates. If the state by its Constitution or laws had forbidden the city or its board to receive and consider any statement or showing made by the appellant touching the subject of rates, a different question would have arisen. But no such case is now presented. In Kentucky Railroad Tax Cases, 115 U. S. 321, 333, 6 Sup. Ct. 57, 61, 29 L. Ed. 414, it was said: 'This return made by the corporation through its officers, is the statement of its own case, in all the particulars that enter into the question of the value of its taxable property, and may be verified and fortified by such explanations and proofs as it may see fit to insert. It is laid by the Auditor of Public Accounts before the board of railroad commissioners, and constitutes the matter on which they are to act. They are required to meet for that purpose on the 1st day of September of each year at the office of the Auditor at the seat of government. * * * These meetings are public and not secret.

The time and place for holding them are fixed by law.'" San Diego Land Co. v. National City, 174 U. S. 739, 752, 19 Sup. Ct. 804, 809, 43 L. Ed. 1154.

A like ruling, based expressly upon this San Diego Case, was subsequently made in Freeport Water Company v. Freeport, 180 U. S. 587–600, 21 Sup. Ct. 493, 45 L. Ed. 679.

It should be remembered in this connection that Ordinance C provides that rates shall be fixed at a regular or special meeting of the city council, held during the month of February of each year, and makes it the duty of every person, firm, or corporation supplying telephone service to said city or its inhabitants to furnish to the city council in the month of January of each year written statements under oath of receipts, revenues, and expenditures during the year preceding the date of such statement, and also an inventory of all the works, lines, plant, and property owned or used by such person, firm, or corporation, necessary or convenient to carrying on its business, and showing the actual cost and present cash value of each item thereof. These provisions of said ordinance are substantially the same as the provisions of the Constitution and statute referred to in the quotation last above made, and bring the case at bar within the principles there enunciated.

The last three decisions, one by the Supreme Court of California and the other two by the Supreme Court of the United States, are determinative of the question of notice, and it is unnecessary to review in detail the numerous cases from other states referred to in plaintiff's brief. The California cases cited at page 13 of said brief, and that of Fallbrook Irrigation District v. Bradley, 164 U. S. 112, 17 Sup. Ct. 56, 41 L. Ed. 369, as well as Hagar v. Reclamation District, 111 U. S. 701, 4 Sup. Ct. 663, 28 L. Ed. 569, and other cases involving special taxes and assessments, are inapplicable here.

Chicago, etc., Ry. Co. v. Minnesota, 134 U. S. 418, 10 Sup. Ct. 462, 33 L. Ed. 970, so far from holding that notice is necessary under the facts of the case at bar, impliedly indicates, that such notice is not required. In that case it was held that notice was necessary largely on the ground that the statute creating the commission made its action final and conclusive, so that the same could not in any way be reviewed by the courts. In the later case, above mentioned, San Diego Land Co. v. National City, 174 U. S. 739–748, 19 Sup. Ct. 804, 807, 43 L. Ed. 1154, the Supreme Court said:

"Upon the point just stated we are referred to the decision of this court in Chicago, Milwaukee, etc., Railway v. Minnesota, 134 U. S. 418, 452, 456, 457, 10 Sup. Ct. 462, 33 L. Ed. 970. That case involved the constitutionality of a statute of Minnesota empowering a commission to fix the rates of charges by railroad companies for the transportation of property. The Supreme Court of the state held that it was intended by the statute to make the action of the commission final and conclusive as to rates, and that the railroad companies were not at liberty, in any form or at any time, to question them as being illegal or unreasonable. This court said: 'This being the construction of the statute by which we are bound in considering the present case, we are of opinion that, so construed, it conflicts with the Constitution of the United States in the particulars complained of by the railroad company.' * * * Observe that this court based its interpretation of the statute of Minnesota upon the construction given to it by the Supreme Court of that state. What this court said about the Minnesota statute can have no ap-

plication to the present case, unless it be made to appear that the Constitution and laws of California invest the municipal authorities of that state with power to fix water rates arbitrarily, without investigation, and without permitting the corporations or persons affected thereby to make any showing as to rates to be exacted or to be heard at any time or in any way upon the subject. The contention of appellant is that such is the purpose and necessary effect of the Constitution of the state. We are not at liberty so to interpret that instrument." San Diego Land Co. v. National City, 174 U. S. 739–748, 19 Sup. Ct. 804, 808, 43 L. Ed. 1154.

In the case at bar, as held in San Diego Water Co. v. San Diego, supra, and San Diego Land Co. v. National City, supra, the action of the city council in fixing telephone rates is not final or conclusive, but open to judicial examination as to whether or not the rates so fixed are reasonable. This last case is fully in point, and holds, upon facts substantially similar to those in the case at bar that notice is unnecessary. The ruling made by me as to the power of the city over telephone rates and the construction of section 9 of Ordinance B sufficiently answer plaintiff's contention as to an estoppel.

My conclusions upon the whole case may be summarized as follows: The charter of the city of Los Angeles, at the time of the passage of the ordinances sought to be annulled, conferred upon said city power to regulate charges for telephone service, and said power was not surrendered or abridged by the grant of plaintiff's franchise, or otherwise, nor do said ordinances, or either of them, contravene any of the provisions of the Constitution of the United States.

The demurrer to the bill is accordingly sustained.